Edward S. Zusman (SBN 154366)
Kevin K. Eng (SBN 209036)
MARKUN ZUSMAN FRENIERE COMPTON LLP
465 California Street, Suite 500
San Francisco, CA 94104
Telephone: (415) 438-4515
Facsimile: (415) 434-4505

Robert W. Cohen (SBN 150310)
LAW OFFICES OF ROBERT W. COHEN
1875 Century Park East, Suite 1770
Los Angeles, CA 90067
Telephone: (310) 282-7586
Facsimile: (310) 282-7589

Attorneys for Plaintiffs
(*additional counsel listed on signature page*)

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

ITALIAN COLORS RESTAURANT, ALAN CARLSON, STONECREST GAS & WASH, SALAM RAZUKI, LAURELWOOD CLEANERS, LLC, JONATHAN EBRAHIMIAN, LEON'S TRANSMISSION SERVICE, INC., VINCENT ARCHER, FAMILY LIFE CORPORATION d/b/a FAMILY GRAPHICS, TOSHIO CHINO,

Plaintiffs,

v.

KAMALA D. HARRIS, in her official capacity as Attorney General of the State of California,

Defendant.

Case No.: 14-cv-00604

**FIRST AMENDED COMPLAINT**

## Introduction

Every time a consumer uses a credit card to make a purchase, the merchant incurs a fee—known colloquially as a "swipe fee." These fees are typically passed on to all consumers in the form of higher prices for goods and services. Both state and federal law, however, permit merchants to

pass swipe fees on to only those consumers who pay with credit cards. Merchants may do so by charging two different prices depending on how the consumer pays: a higher price for using a credit card, and a lower price for using other payment methods (cash, a personal check, or a debit card). But, in California, merchants may engage in dual pricing only if they communicate the difference between the cash price and the credit price using the right *language:* A California law allows merchants to offer "discounts" for using cash or a debit card, yet makes it illegal to impose "surcharges" for using a credit card—even though the conduct in both cases (the use of dual pricing) is the same.

That "virtually incomprehensible distinction between what a vendor can and cannot tell its customers" has already caused one federal court to strike down New York's indistinguishable statute as an impermissible restriction on free speech and as unconstitutionally vague. *Expressions Hair Design v. Schneiderman*, --- F. Supp. 2d ---, 2013 WL 5477607, *1 (S.D.N.Y. Oct. 3, 2013). And the only other federal court to consider state no-surcharge laws has signaled its agreement, calling the statutes "anti-consumer" and "irrational," and finding "good reason to believe" that the remaining no-surcharge laws will be overturned. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, --- F. Supp. 2d ---, 2013 WL 6510737, *19-*20 (E.D.N.Y. Dec. 13, 2013).

California's no-surcharge law, CAL. CIV. CODE § 1748.1, is no different. Like New York's, it violates the First Amendment to the U.S. Constitution and is unconstitutionally vague. The plaintiffs are merchants who seek a declaration that the law is unconstitutional and an injunction preventing the State of California from enforcing the law against them.

**Jurisdiction**

1. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

**Parties**

2. Plaintiff Italian Colors Restaurant is an Italian restaurant in Oakland, California. For a small family business like Italian Colors, credit-card swipe fees make a huge difference. Italian Colors has found that, until they are educated on the issue, most consumers are not aware of the high cost of swipe fees or the ways in which they burden all sorts of small businesses. But when they learn of the fees, Italian Colors patrons are generally sympathetic. Italian Colors has therefore

sought to do what it can to ensure that consumers learn about the cost of using credit cards and take that information into account when they buy goods and services—not just at Italian Colors, but at businesses nationwide.

3. This concern over the sky-high cost of credit-card swipe fees led Italian Colors to serve as the lead plaintiff in a nationwide antitrust class action against American Express, a case that went to the U.S. Supreme Court and that ultimately resulted in a national settlement this past December under which American Express has finally agreed to drop its contractual no-surcharge rules. Under the terms of the injunctive relief in that case, merchants may charge different prices depending on whether customers pay with credit or with cash or debit, and may label that price difference as a "surcharge" or an "extra charge" for credit rather than a "discount" for cash or debit.

4. But despite this hard-won relief—and parallel relief that merchants have won forcing Visa and MasterCard to rescind their own no-surcharge rules—Italian Colors still may not charge different prices for cash and credit and label the difference a "surcharge" because California's no-surcharge law bars Italian Colors from using that word. Italian Colors is aware that California's law would allow it to engage in the same conduct and frame the price difference as a "discount" for cash. But that would make prices look higher than they are and would not, in Italian Colors' view, most effectively convey the costs of credit to its customers. And the law's discount/surcharge distinction is so vague that Italian Colors is afraid to have any dual pricing at all, lest it run afoul of the law. The restaurant would have to instruct its employees on the difference between a "surcharge" and a "discount," which even its owners do not fully understand, and then constantly monitor the employees to make sure that each one is sticking to the script. Rather than risk the law's wrath to say something that it believes is only marginally effective at communicating its message, Italian Colors stays away from dual pricing altogether.

5. Plaintiff Alan Carlson is the owner of Italian Colors Restaurant and is responsible for its day-to-day management.

6. Plaintiff Stonecrest Gas and Wash is a gas station, auto repair, car wash, and convenience store in San Diego, California. Stonecrest opened in 2004 and has been accepting credit cards since that time. A large portion of Stonecrest's sales are on credit cards. In 2013 alone,

Stonecrest had nearly 16 million dollars of sales on credit cards. On average, the company pays between 2% and 3% of each transaction on credit-card swipe fees. These fees are a large operating expense for Stonecrest. When the company's owners first went into business, they were shocked at the high swipe fees that the credit-card companies were charging. They were further frustrated when they realized that small merchants were powerless to negotiate these fees, which are set on a take-it-or-leave-it basis.

7. Initially, Stonecrest included the expense of swipe fees in the prices paid by all of its customers—regardless of whether those customers paid in cash or credit. But charging a single price regardless of payment had the effect of hiding the true cost of credit and giving credit-card customers little incentive to switch to cash. In an effort to communicate the high cost of swipe fees to its customers and encourage them to pay with cash or debit, Stonecrest began offering a discount to customers who pay with cash or debit. When customers ask why they give a discount, Stonecrest's employees explain that it is because of the high fees that the credit-card companies charge the company when customers pay with a credit card. For the most part, Stonecrests's customers have been supportive and are often surprised to learn how much the company pays in merchant fees.

8. Stonecrest understands that, in light of the recent changes in the credit-card company's contractual rules, merchants are now permitted to label the difference between the cash price and the credit price as a "surcharge" rather than a "discount." Describing the price difference as a surcharge would, in Stonecrests's view, allow the company to effectively inform our customers about merchant fees in a manner that will cause them to pay attention. This is an important political and economic issue to Stonecrest and its owners and employees, and they want to be able to use the strongest messaging possible. Stonecrest believes that framing the price difference as a "surcharge" would be more effective, and would like to frame its prices in this way, but does not do so for fear of violating California's no-surcharge law.

9. Salam Razuki is the co-owner of Stonecrest Gas & Wash.

10. Laurelwood Cleaners, LLC is a family-owned business that operates Laurelwood Cleaners and Laundry in Studio City, California, and Milo's Cleaners and Laundry in North

Hollywood, California. Both locations accept all credit cards, and have done so since 1985. When a customer uses a credit card for payment, the company typically pays between 2% and 3% of the transaction total in swipe fees, and sometimes more. Even though it imposes a $10 minimum for all credit-card transactions, most customers choose to pay using credit cards. The company therefore pays thousands of dollars each year in credit-card transaction fees. As a small dry cleaning business in Los Angeles, where rent is extraordinarily high and where the profit per item is usually no more than one dollar, these fees make a huge difference.

11. In the 1990s, Milo's charged a higher price to customers who used credit cards, which it expressed as an additional fee for credit-card use. However, it stopped the practice after several months because it learned that it was illegal in California to tell customers that credit transactions are more expensive than cash. If not for the law, Milo's would again charge different prices and explain the difference as a "surcharge" so that customers would be made aware of the high costs of credit that merchants pay in this country.

12. Jonathan Ebrahimian is owner of Laurelwood Cleaners LLC.

13. Leon's Transmission Service, Inc. provides transmission repair services at seven locations throughout Southern California. A substantial portion of the company's sales are paid with credit cards, and credit-card fees are one of its largest non-payroll-related operating expenses. Since 2004, Leon's has paid more than $300,000 in interchange fees to Visa alone. The high cost led Leon's to consider requiring customers to pay in cash, but it determined that accepting credit cards was necessary to avoid losing customers to other transmission repair companies.

14. Leon's customers are generally unaware that it is very expensive for Leon's to accept credit cards, and are consistently surprised when told that there is a fee associated with credit-card purchases. Leon's would like to communicate to its customers the costs of accepting credit cards in the most effective way: by telling them that prices are higher if they use a credit card. It believes that communicating the cost of credit in this way would inform customers of the costs of credit and help guide them to other, cheaper payment forms. Leon's does not want to communicate this information by saying it provides a "discount" for using cash. Calling it a "discount" would make the

company's advertised prices look higher than they are, without communicating the information it wants to communicate to customers: that the higher price is due solely to credit-card fees.

15. But Leon's cannot communicate the cost of credit in this way because of California's no-surcharge law. So it has instead decided to charge just one price for every good or service, regardless of whether the customer uses cash or credit. As a result, the costs of credit are built into the costs of all goods and services. If it were legal to communicate the cost of credit as a "surcharge," Leon's could instead offer a lower base price (with an additional surcharge for using a credit). Leon's believes that doing so would cause more customers to use a cheaper payment method than credit, saving both the company and its customers more money over time.

16. Leon's has been passionate about the issue of credit-card reform for more than 15 years, focusing on ways it can reduce its credit-card-acceptance costs. In pursuit of that goal, Leon's has:

(a) beginning in 2002, successfully sued its then payment-card processor, Wells Fargo Bank, N.A., for the recovery of unauthorized fees in the California Superior Court, Los Angeles County; and

(b) beginning in 2005, served as a named plaintiff and class representative in *In re Payment Card Interchange Fee and Merchant Discount Litigation*, brought in the Eastern District of New York. A final settlement in that case was approved in December 2013. As a result of the settlement in that case, Visa and MasterCard have now changed their rules to allow merchants to communicate the difference between paying with a credit card and paying with cash as a "surcharge" for using credit—which is the most effective way of expressing the high cost of credit to customers. But Leon's and other merchants located in California are unable to take advantage of this settlement benefit because of California's no-surcharge law.

17. Vincent Archer is administrator and controller of Leon's. In that capacity, he is generally in charge of finances and is responsible for all matters related to credit-card acceptance for all of Leon's locations.

18. Family Life Corporation, doing business as Family Graphics, is a California website-design company. The business also provides graphic-design and custom-print-work services, such as brochures, pamphlets, and business cards. Family Graphics began accepting credit cards in 1997. When a customer uses a credit card to pay for services, the company typically pays 3% to 4% of the transaction total to the credit-card company. Family Life would like to pass on these costs directly to customers by charging different prices depending on the method of payment used. The company does not do so, however, because California law makes it illegal to describe the pricing system as a "surcharge." So it instead increases its prices for everyone, in order to account for the fact that a customer may use a credit card for payment, making its prices less competitive compared with large corporations.

19. Although Family Life could describe the differential pricing as a "discount," that would not communicate the fees that the company pays for accepting credit cards and is not the way the company wants to characterize its prices to customers. Describing the differential pricing as a "surcharge" would inform customers that they are paying more solely because of those fees, allowing them to decide for themselves whether to incur them. In addition, Family Life's customers are predominantly Japanese expatriates, and therefore it is difficult for the company to explain this subtle—but legally significant—difference in a manner that they are able to understand. Family Life is not willing to take the risk of violating California law because of how it truthfully describes its prices to our customers. If it became legal for Family Life to tell customers that it charges more for credit-card use, that is exactly what it would do.

20. Toshio Chino is one of the owners of Family Life Corporation.

21. Defendant Kamala D. Harris is the Attorney General of California and is responsible for enforcing the laws of the State of California, including the state's no-surcharge law. She is named in her official capacity only.

## Factual Background

22. Americans pay some of the highest swipe fees in the world—seven or eight times those paid by Europeans, according to estimates by the Merchants Payments Coalition. The main reason swipe fees are so high is that they are kept hidden from consumers, who decide which payment method to use and thus determine whether a fee will be incurred in the first place. According to one survey, about 41% of American credit-card users are completely unaware that merchants are charged fees to process credit-card transactions. Although merchants are allowed to charge consumers more for using credit than for using cash, merchants cannot effectively communicate that added cost because California and other states force them to call it a "discount" for cash rather than a "surcharge" for credit.

23. California's no-surcharge law makes it unlawful for any "retailer in any sales, service, or lease transaction with a consumer [to] impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means." CAL. CIV. CODE § 1748.1(a). California's no-surcharge law does *not*, however, outlaw dual pricing. The law expressly states that a retailer may "offer discounts for the purpose of inducing payment by cash, check, or other means not involving the use of a credit card, provided that the discount is offered to all prospective buyers." *Id.*

24. Until 2013, California's no-surcharge law was effectively redundant because credit-card companies imposed similar speech prohibitions in their contracts with merchants. But after federal antitrust litigation caused the three dominant credit-card companies (Visa, MasterCard, and American Express) to agree to change their contracts to remove their no-surcharge rules, California's law took on added importance. It is now the only thing keeping the plaintiffs from saying what they would like: that they impose a "surcharge" for using credit because credit costs more.

### I. Why labels matter: the communicative difference between "surcharges" and "discounts"

25. A "surcharge" on credit and a "discount" for cash "are different frames for presenting the same price information—a price difference between two things." Adam J. Levitin,

*Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1351-52 (2008). They are identical in every way except one: the *label* that the merchant uses to communicate that price difference.

26. But labels can matter. "[T]he frame within which information is presented can significantly alter one's perception of that information, especially when one can perceive the information as a gain or a loss," as with the price difference between using cash and using credit. Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: Some Evidence Of Market Manipulation*, 112 Harv. L. Rev. 1420, 1441 (1999). This is largely because of a well-known cognitive phenomenon called "loss aversion," which refers to people's tendency to let "changes that make things worse (losses) loom larger than improvements or gains" of an equivalent amount. Daniel Kahneman, Jack L. Knetsch, & Richard H. Thaler, *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Persp. 193, 199 (1991). Put more simply: "people have stronger reactions to losses and penalties than to gains." Adam J. Levitin, *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 Berkeley Bus. L.J. 265, 280 (2006).

27. Because of this, "[c]onsumers react very differently to surcharges and discounts," even though they present the exact same pricing information. *Id.* Consumers are more likely to respond to surcharges (which are perceived as *losses* for using credit) than to discounts (which are perceived as *gains* for not using credit). *Id.* Research shows just how wide this gap is. In one study, 74% of consumers had a negative or strongly negative reaction to credit surcharges, while fewer than half had a negative or strongly negative reaction to cash discounts. That difference—the difference in how the same pricing information is understood by consumers—influences their behavior, making "surcharges" a much more effective way to communicate the costs of credit to consumers.

28. The effectiveness of surcharges is why the plaintiffs in this case seek to impose them: surcharges inform consumers of the costs of credit, letting consumers decide for themselves whether credit's benefits outweigh its costs. That exchange of information creates meaningful competition, which in turn drives down costs—as demonstrated by price-transparency reforms in Europe and Australia. If consumers are made aware of swipe fees and determine that they are too

high, consumers will use a different payment method, and banks and credit-card companies will have to lower their fees to attract more business. Indeed, in Australia, where regulators in 2003 allowed complete transparency of price information and merchants have responded with surcharges, swipe fees have greatly declined.

29. But when the government prohibits framing the added cost of credit as a "surcharge," as California has done, merchants lose their most effective means of informing consumers of the high costs of credit. Moreover, because the dividing line between what constitutes a "surcharge" and what constitutes a "discount" is so blurry, many merchants (including many of the plaintiffs in this case) do not even attempt to offer dual pricing, even though the law allows it, to avoid accidentally subjecting themselves to liability. And many other merchants falsely believe that they may not offer any dual pricing at all. The upshot, then, is that merchants end up passing on swipe fees to *all* consumers by raising the prices of goods and services across the board. This means that consumers are unaware of how much they pay for credit and have no incentive to reduce their credit-card use because they will pay the same price regardless. As a result, swipe fees have soared.

30. Swipe fees thus function as an invisible tax, channeling vast amounts of money from consumers to some of the nation's largest banks and credit-card companies. Because cash and credit purchasers both pay this tax, swipe fees are also highly regressive: low-income cash purchasers subsidize the cost of credit cards, while enjoying none of their benefits or convenience. According to Federal Reserve economists, "[b]y far, the bulk of [this subsidy] is enjoyed by high-income credit card buyers," who receive an average of $2,188 every year, paid disproportionately by poor and minority households. The result is a regime in which food-stamp recipients are subsidizing frequent-flier miles.

31. For these reasons, numerous prominent economists and consumer advocates—from Joseph Stiglitz to Elizabeth Warren—have opined that no-surcharge policies are bad for consumers and hurt competition.

## II. The credit-card industry's concerted efforts to prevent merchants from communicating the costs of credit as "surcharges"

32. The invisibility of swipe fees is no accident. It is the product of concerted efforts by the credit-card industry over many decades to ensure that merchants cannot communicate to consumers the added price they pay for using credit. Over the years, the industry has succeeded, both through contractual provisions and legislative measures, to silence merchants' attempts to call consumers' attention to the true costs of credit.

**The industry's early ban on differential pricing ends**

33. In the early days of credit cards, any attempt at differential pricing between credit and non-credit transactions was strictly forbidden by rules imposed on merchants in their contracts with credit-card companies. That changed in 1974 after two important developments. *First*, Consumers Union sued American Express on the ground that its contractual ban on differential pricing was an illegal restraint on trade. Rather than face the prospect that federal courts would mandate full price transparency, American Express almost immediately settled the suit by agreeing to allow merchants to provide consumers with differential price information.

34. *Second*, Congress then enacted legislation protecting the right of merchants to have dual-pricing systems. Congress amended the Truth in Lending Act to provide that "a card issuer may not, by contract, or otherwise, prohibit any such seller from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card." Pub. L. No. 93, § 495, 88 Stat. 1500 (1974).

**The credit-card industry shifts its strategy to labeling**

35. The 1974 amendments were initially considered a victory for consumers. But the credit-card industry, seizing on Congress's use of the word "discount," soon shifted its focus to the way merchants could *label* and *describe* such pricing to consumers. Aware that how information is presented to consumers can have a huge impact on their behavior—and that many merchants would avoid dual pricing altogether if "surcharges" were outlawed—the credit-card lobby "insist[ed] that any price difference between cash and credit purchases should be labeled a cash discount rather than a credit card surcharge." Amos Tversky & Daniel Kahneman, *Rational Choice and the Framing of Decisions*, 59 J. Bus. S251, S261 (1986).

**The credit-card industry's labeling strategy achieves short-**

**lived success at the national level**

36. In 1976, after two years of lobbying Congress to impose the credit-card industry's preferred speech code, the industry succeeded in getting Congress to enact a temporary ban on "surcharges," despite the authorization for "discounts." *See* Pub. L. No. 94–222, 90 Stat. 197 ("No seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means."). This controversial measure set the stage for a series of battles over renewal of the ban, culminating in an intense political debate in the mid-1980s that pitted both the Reagan Administration and consumer groups against the credit-card industry.

37. With the "surcharge" ban set to expire in 1981, the federal government and consumer advocates registered the impact that it had on consumers' and merchants' behavior. The Chairman of the Federal Trade Commission, writing in opposition to extending the law, recognized that the "surcharge" label drives home the true marginal cost of a credit transaction to the consumer. S. Rep. 97-23, at 11-12. Although "a discount and a surcharge are equivalent concepts," he remarked, "one is hidden in the cash price and the other is not," meaning that a ban on "surcharges" prohibited merchants from disclosing to their customers the true cost of credit. *Id.* at 10.

38. The Federal Reserve Board held a similar view. One member—presenting the Board's unanimous opposition to the surcharge ban's extension—pointed out "the obvious difficulty in drawing a clear economic distinction between a permitted discount and a prohibited surcharge." *Cash Discount Act, 1981: Hearings on S. 414 Before the Subcomm. On Consumer Affairs of the Senate Comm. On Banking, Housing, & Urban Affairs*, 97th Cong., 1st Sess. 9 (Feb. 18, 1981) (Nancy Teeters, Federal Reserve Board). "If you just change the wording a little bit, one becomes the other." *Id.* at 22. The Board thus proposed "a very simple rule": that both surcharges and discounts be allowed, and "that the availability of the discount or surcharge be disclosed to consumers." *Id.* at 10.

39. Every major consumer advocacy organization agreed, and urged Congress to let the ban lapse and allow surcharges. One consumer advocate testified that the difference between

surcharges and discounts "is merely one of semantics, and not of substance." *Id.* at 98 (Ellen Broadman, Consumers Union). But "the semantic differences are significant," she explained, because "the term 'surcharge' makes credit card customers particularly aware that they are paying an extra charge," whereas "the discount system suggests that consumers are getting a bargain, and downplays the truth." *Id.* Another advocate put it more pithily: "one person's cash discount may be another person's surcharge." *Id.* at 90 (Jim Boyle, Consumer Federal of America). "Removing the ban on surcharges," he explained, "is an important first step" to "disclos[ing] to consumers the full" cost of credit so that they can "make informed judgments." *Id.* at 92.

40. On the other side of the debate, American Express and MasterCard "wholeheartedly" and "strongly" supported the ban, even though, from a "mathematical viewpoint," "there is really no difference between a discount for cash and a surcharge for credit card use." *Id.* at 43 (Hugh H. Smith, American Express); *id.* at 55 (Amy Topiel, MasterCard). And the big banks, like the credit-card giants, supported treating "surcharges" and "discounts" differently because a surcharge "makes a negative statement about the card to the consumer." *Id.* at 32 (Peter Hood, American Bankers Association). Surcharges, a banking lobbyist openly explained, "talk against the credit industry." *Id.* at 60. Congress ultimately gave in to industry lobbying and renewed the ban for an additional three years. Pub. L. No. 97–25, 95 Stat. 144 (1981).

41. In 1984, the no-surcharge law was again set to expire. Senator William Proxmire of Wisconsin, one of the ban's chief opponents, cut to the chase: "Not one single consumer group supports the proposal to continue the ban on surcharges," he observed. "The nation's giant credit card companies want to perpetuate the myth that credit is free." Irvin Molotsky, *Extension of Credit Surcharge Ban*, N.Y. Times, Feb. 29, 1984, at D12. The credit-card industry, acutely conscious of the threat that merchants' disclosure of credit's true cost posed to its business model, responded by unleashing a massive lobbying campaign to oppose ending the ban. Stephen Engelberg, *Credit Card Surcharge Ban Ends*, N.Y. Times, Feb. 27, 1984, at D1. One senior vice president of Shearson/American Express remarked in 1984 that his company had been opposing ending the ban for eight years. He observed that consumers do not write angry letters to credit-card companies about cash discounts, but do complain about surcharges. *Id.* He concluded that ending the ban

"could potentially hurt the image of" credit cards, revealing that the industry viewed its legislative efforts as playing a key role in dictating the perception of credit cards among consumers. *Id.* This time, the industry's efforts failed, and the ban lapsed in 1984. Levitin, *Priceless?*, 55 UCLA L. Rev. at 1381.

42. A 1981 report of the Senate Banking Committee, prepared as part of the law's initial renewal, stressed the law's role in regulating how a merchant could frame a dual-pricing system. The Committee observed that "while discounts for cash and surcharges on credit cards may be mathematically the same, their practical effect and the impact they may have on consumers is very different." S. Rep. 97-23, at 3. The no-surcharge law thus effectively set forth a speech code, requiring that merchants label their prices in the way that best hid the costs of credit and most enabled the credit-card companies to take advantage of the framing effect: by advertising the credit price as the "regular" price, and the cash price as a "discount" from that price.

43. Furthermore, the vague distinction between "discounts" and "surcharges," and the risk of inadvertently describing a dual-pricing system in an unlawful way, led merchants to steer clear of such systems. In an editorial in *The New York Times*, Senator Christopher Dodd of Connecticut, a proponent of allowing surcharges, noted that "many merchants are not sure what the difference between a discount and a surcharge is and thus do not offer different cash and credit prices for fear they will violate the ban on surcharges." Sen. Christopher J. Dodd, *Credit Card Surcharges: Let the Gouger Beware*, N.Y. Times, Mar. 12, 1984, at A16. *See also* Carol Krucoff, *When Cash Pays Off*, Wash. Post, Sept. 22, 1981 (describing consumer activist who argued that merchants have not offered cash discounts because "the regulations have been so complicated. Smaller business people, who are most likely to offer them, may have been intimidated by the fear it could be viewed as an illegal surcharge."); Engelberg, *Credit Card Surcharge Ban Ends*, at D1 ("A House aide said that one explanation for the relative unpopularity of cash discounts is that retailers, aware that surcharges on credit purchases are illegal, have erroneously assumed that discounts are not permitted.").

**The credit-card industry lobbies the states to enact no-surcharge laws and adopts contractual no-surcharge rules**

44. After the controversial federal ban expired, the credit-card industry briefly turned to the states, convincing fewer than a dozen (including California) to enact no-surcharge laws of their own. In an early instance of the phenomenon now known as "astroturfing," American Express and Visa went to great lengths to create the illusion of grassroots support for such laws, even going so far as to create and bankroll a fake consumer group called "Consumers Against Penalty Surcharges." But real consumer groups—including Consumers Union and Consumer Federation of America—opposed state no-surcharge laws because they discouraged merchants from making the costs of credit transparent, which resulted in an enormous hidden tax paid by all consumers whenever they made a purchase.

45. California's law was enacted in 1985, one year after expiration of the temporary federal ban. Shortly thereafter, a New York court concluded that, under that state's no-surcharge law, "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the *label* the individual affixes to his economic behavior, without substantive difference." *People v. Fulvio*, 517 N.Y.S.2d 1008, 1011 (Crim. Ct. N.Y. 1987) (emphasis in original). The court explained: "[W]hat [the law] *permits* is a price differential, in that so long as that differential is characterized as a discount for payment by cash, it is legally permissible; what [the law] *prohibits* is a price differential, in that so long as that differential is characterized as an additional charge for payment by use of a credit card, it is legally impermissible. . . . [The law] creates a distinction without a difference; it is not the *act* which is outlawed, but the *word* given that act." *Id.* at 1015 (emphasis in original).

46. Around the same time that California's no-surcharge law was enacted, the major credit-card companies changed their contracts with merchants to include no-surcharge rules. No-surcharge laws in California and other states thus function as a legislative extension of the restrictions that credit-card issuers previously imposed more overtly by contract. For instance, American Express's contracts with merchants included an elaborate speech code. The contracts provided that merchants may not "indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card"; "try to dissuade Cardmembers from using the Card"; "criticize ... the Card or any of our services or programs"; or "try to persuade or prompt

Cardmembers to use any Other Payment Products or any other method of payment (e.g., payment by check)."

**The Durbin Amendment and the recent political controversy over swipe fees**

47. From the mid-1980s until the 2000s the issue of swipe fees remained largely in the shadows. Even in the majority of states without anti-surcharge laws, the contractual no-surcharge rules ensured that consumers were rarely informed of the true costs of credit. Developments in the late 2000s, however, caused swipe fees to reemerge as a volatile political issue.

48. The global financial crisis of 2007-2008 and the ensuing push for financial-regulation reform resulted in renewed focus on swipe fees. Senator Dick Durbin of Illinois proposed an amendment to the Senate version of the Dodd-Frank Wall Street Reform and Consumer Protection Act that aimed to reduce the fees associated with transactions by both debit and credit cards. Although proposed legislation to regulate *credit-card* swipe fees was defeated, the Durbin Amendment was enacted into law. As enacted, it establishes a procedure by which the Federal Reserve Board now sets the maximum swipe fees for *debit-card* transactions. 15 U.S.C. § 1693o-2(a). It also includes a provision protecting merchants' rights to offer consumers incentives for using different payment methods: "A payment card network shall not ... by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person to provide a discount or in-kind incentive for payment by the use of cash, checks, debit cards, or credit cards." *Id.* § 1693o-2(b)(2).

49. The fight over the Durbin Amendment shone a spotlight on the amount of revenue that banks generate from swipe fees, initiated a frenzy of lobbying by the credit-card industry, and touched off a contentious national political debate. Many merchants sought to convey their opposition to swipe fees directly to their customers—and voters—at the checkout counter. The national convenience store chain 7-Eleven, for example, put up signs asking customers to "STOP UNFAIR CREDIT CARD FEES" and gathered a total of 1.6 million signatures on a petition to support legislation on credit-card fees. 7-Eleven claimed that its petition represented the largest quantity of signatures ever presented to Congress—trumping even the 1.3 million signatures presented to Congress regarding national healthcare reform.

**Visa, MasterCard, & American Express drop their no-surcharge rules**

50. In May 2005, Animal Land Inc., a pet-relocation company based in Atlanta, Georgia, sued Visa for a declaration that its no-surcharge rule violated antitrust laws by preventing Animal Land and other merchants from assessing a discrete, denominated charge upon customers using credit cards, as opposed to cash, checks, or debit cards. *Animal Land, Inc. v. Visa USA, Inc.*, No. 05-CV-1210 (N.D. Ga.). In the ensuing months, numerous U.S. merchants and trade associations brought claims against the dominant credit-card networks, alleging that they engaged in illegal price-fixing and impermissibly banned merchants from encouraging customers to use less expensive payment methods.

51. Under the terms of a national class-action settlement, Visa and MasterCard in January 2013 dropped their prohibitions against merchants imposing surcharges on credit-card transactions. And in December 2013—in response to a separate lawsuit—American Express agreed to drop its surcharge ban as well.

52. As a result, state no-surcharge laws—previously redundant because of contractual no-surcharge rules—have now gained added importance. And as they did in the 1980s, credit-card companies are once again seeking to discourage dual pricing by pushing state legislation that dictates the labels that merchants can use for such systems.

**New York's no-surcharge law is declared unconstitutional**

53. In June 2013, five merchants—supported by several national consumer groups and retailers as amici curiae—brought a constitutional challenge to New York's no-surcharge law in federal district court, claiming that it violated the First Amendment and was unconstitutionally vague. By making liability "turn[] on the language used to describe identical conduct," they argued, the law is a content-based speech restriction that is subject to heightened scrutiny, which it cannot withstand. They further argued that the law is unconstitutionally vague because it does not define the line between a "surcharge" and a "discount," and "[y]et that line marks the difference between what is [illegal] and what is not."

54. The court agreed. In October 2013, it declared the law unconstitutional and granted a preliminary injunction against its enforcement. *See Expressions*, --- F. Supp. 2d ---, 2013 WL 5477607. One month later, final judgment, including a permanent injunction, was entered in favor of the plaintiffs.

## Claims for Relief

### Claim One: Violation of the First Amendment (under 42 U.S.C. § 1983)

55. California's no-surcharge law regulates how the plaintiffs may characterize the price differences they may lawfully charge for credit and cash purchases. The law allows them to tell their customers that they are paying *less* for using cash or other means of payment (a "discount"), but not that they are paying *more* for using credit (a "surcharge"). This state-imposed speech code prevents the plaintiffs from effectively conveying to their customers—who absorb the costs of credit through higher prices for goods and services—that credit cards are a more expensive means of payment.

56. By prohibiting certain disfavored speech by merchants, California's no-surcharge law violates the plaintiffs' First Amendment rights, as applied to the states through the Fourteenth Amendment. Because the no-surcharge law is a content- and speaker-based restriction on speech, it is subject to heightened scrutiny under the First Amendment. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011). Regardless of whether the law is analyzed under a special commercial-speech inquiry, it cannot survive. The prohibited speech concerns lawful activity (engaging in dual pricing) and is not misleading; California has no substantial interest in prohibiting the speech; and California's no-surcharge law does not directly advance—and is far more extensive than necessary to serve—any interest the state might have. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980).

### Claim Two: Void for vagueness (under 42 U.S.C. § 1983)

57. California's no-surcharge law does not provide guidance about what speech is permitted and invites arbitrary and discriminatory enforcement. Because the law makes liability turn on the blurry difference between two ways of describing the same conduct, the law does not provide a person of ordinary intelligence reasonable opportunity to know what is prohibited.

Additionally, the law lacks explicit standards for those charged with its enforcement. It is therefore unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.

**Request for Relief**

The plaintiffs request that the Court:

A. Declare that California's no-surcharge law is unconstitutional and enjoin its enforcement;

B. Award the plaintiffs their reasonable costs, expenses, and attorney's fees under 42 U.S.C. § 1988; and

C. Grant the plaintiffs all other appropriate relief.

Respectfully submitted,

Dated: April 1, 2014

MARKUN ZUSMAN FRENIERE & COMPTON LLP

By: /s/ Edward S. Zusman______________________
Edward S. Zusman
Kevin K. Eng

Deepak Gupta*
Gregory A. Beck
Jonathan E. Taylor
GUPTA BECK PLLC
1625 Massachusetts Avenue, NW
Suite 500
Washington, DC 20036
(202) 470-3826

Gary B. Friedman*
Tracey Kitzman
Rebecca Quinn
FRIEDMAN LAW GROUP LLP
270 Lafayette Street
New York, NY 10012
(212) 680-5150

Howard M. Jaffe
JAFFE + MARTIN
1801 Century Park East
Suite 1600
Los Angeles, CA 90067
(310) 226-7770

Alex M. Tomasevic
NICHOLAS & TOMASEVIC LLP
225 Broadway - 19th Floor
San Diego, CA 92101
(619) 325-0492

Attorneys for Plaintiffs

* *Pro hac vice applications forthcoming*