Thomas S. Knox, Esquire
KNOX, LEMMON & ANAPOLSKY, LLP
300 Capitol Mall
Suite 1125
Sacramento, CA 95814
Tel:    (916) 498-9911
Fax:    (916) 498-9991
E-mail:  tknox@klalawfirm.com

*Counsel for Amici Curiae*

[See signature page for additional counsel for Amici Curiae]

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| | 2:14-cv-00604-MCE-DAD |
| **ITALIAN COLORS RESTAURANT, ALAN CARLSON, LAURELWOOD CLEANERS, LLC, JONATHAN EBRAHIMIAN, FAMILY LIFE CORPORATION d/b/a FAMILY GRAPHICS, TOSHIO CHINO,**<br><br>        **Plaintiffs,**<br><br>v.<br><br>**KAMALA D. HARRIS, in her official capacity as Attorney General of the State of California,**<br><br>        **Defendant.** | **MOTION OF NON-PARTIES CALIFORNIA RETAIL ASSOCIATION, CALFIORNIA GROCERS ASSOCIATION, SAFEWAY INC., THE KROGER CO., WALGREEN CO., ALBERTSON'S LLC, HY-VEE, INC. AND RITE AID CORPORATION FOR LEAVE TO FILE A MEMORANDUM OF LAW AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          December 4, 2014<br>Time:          2:00 pm<br>Courtroom:  7, 14th Floor<br>Judge:         Hon. Morrison C. England, Jr.<br>Trial Date:   None<br>Action Filed:  March 5, 2014 |

1    Non-parties California Retail Association, California Grocers Association, Safeway Inc.,

2    The Kroger Co., Walgreen Co., Albertson's LLC, Hy-Vee, Inc. and Rite Aid Corporation (the

3    "proposed Amici") hereby move for leave to file an amicus curiae memorandum of law in the

4    above-captioned case in support of Plaintiffs' motion for a preliminary injunction.  Counsel for

5    Plaintiffs and the State of California have informed us that they have no objection to this motion.

6    District courts have broad discretion to permit amici curiae participation.  *See, e.g.*, *Missouri*

7    *v. Harris*, 2014 WL 2987284, at *2 n.2 (E.D. Cal. Jun. 30, 2014).  Courts routinely grant leave for

8    amicus filings when "the amicus has unique information or perspective that can help the Court

9    beyond the help that the lawyers for the parties are able to provide."  *Id.*; *Re2Con, LLC v. Telfer Oil*

10   *Co.*, 2012 WL 6570902 (E.D. Cal. Dec. 17, 2012).  "A court may grant leave to appear as an amicus

11   if the information offered is timely and useful."  *National Petrochemical & Refiners Ass'n. v.*

12   *Goldstene*, 2010 WL 2228471, at *1 (E.D. Cal. Jun. 3, 2010).  "In addition, participation of amicus

13   curiae may be appropriate where legal issues in a case have potential ramifications beyond the

14   parties directly involved."  *Id.*

15   Here, the proposed Amici are uniquely positioned and will provide perspective on the

16   effects of this case beyond the parties.  The California Retail Association ("CRA") is a statewide

17   trade association covering all segments of the retail industry, including general merchandise,

18   department stores, mass merchandisers, fast food restaurants, convenience stores, supermarkets and

19   grocery stores, chain drug, and specialty retail such as auto, vision, jewelry, hardware, and home

20   stores.  The California Grocers Association ("CGA") is a statewide trade association that represents

21   approximately 500 retail members operating over 6,000 food stores in California and Nevada, and

22   approximately 300 grocery suppliers companies.  Retail membership in the CGA includes chain and

23   independent supermarkets, convenience stores, and mass merchandisers.  Together, the CRA and

24   CGA's participation as amicus curiae can be helpful to the Court in showing that the swipe fee

25   problem at the heart of Plaintiffs' case is one that affects merchants across a wide variety of

26   industries.

27

28

1

In addition to representing a broad spectrum of merchants, the proposed Amici include large national retailers who, after eight years of hard-fought antitrust litigation, have forced Visa and MasterCard to rescind their rules banning surcharges on credit card transactions. These retailers compete in industries with nearly universal acceptance of credit cards. They, like many other merchants, must accept credit cards to remain viable as a matter of commercial reality, even in the face of very large and increasing swipe fees. These retailers also participated as amici curiae in the *Expressions Hair Design* matter, in which New York's credit card surcharging statute was held to be unconstitutional.

Another reason why the proposed Amici can provide a unique perspective is that the Plaintiffs are all small merchants, who are subject to standard form card acceptance agreements and have no opportunity to negotiate swipe fees with credit card companies or banks. Large merchants, on the other hand, negotiate their merchant contracts on an individual basis with credit card companies and banks. The Amici, who either themselves are large merchants or whose membership includes large merchants, are uniquely positioned to speak about how the inability to surcharge impedes the ability of sizeable merchants to engage in real rate negotiations with credit card companies.

The proposed Amici understand that if they or their members were free to surcharge credit cards, many consumers when faced with such a surcharge would switch to less expensive payment methods, like debit cards. That switch to debit cards alone would greatly help merchants reduce their overall costs of accepting payment cards. In addition, because framing a price differential as a surcharge is especially effective in shifting business away from high-cost credit cards, the proposed Amici or their larger members would also be able to use the *threat* of surcharge as a tool in bargaining with credit card companies for lower swipe fees. This threat is not a tool that smaller merchants have. And yet, one key reason why the California statute harms the public interest and competition in the marketplace is precisely because it removes from large merchants the ability to discipline pricing by threatening to surcharge more expensive card networks.

2

For these reasons, the proposed Amici respectfully request that the Court grant this motion for leave to file a memorandum of law as amici curiae.  A copy of the memorandum is attached as Exhibit 1.

Dated:   Sacramento, CA
         November 10, 2014

Respectfully submitted,

Thomas S. Knox, Esquire
KNOX, LEMMON & ANAPOLSKY, LLP
300 Capitol Mall
Suite 1125
Sacramento, CA 95814
Tel:     (916) 498-9911
Fax:     (916) 498-9991
E-mail: tknox@klalawfirm.com


By: _____/s/_____

- and -

KENNY NACHWALTER, P.A.
Richard Alan Arnold, Esquire
William J. Blechman, Esquire
James Almon, Esquire
201 S. Biscayne Boulevard
Suite 1100
Miami, Florida  33131-4327
Tel:     (305) 373-1000
Fax:     (305) 372-1861
E-mail:  rarnold@knpa.com
         wblechman@knpa.com
         jalmon@knpa.com

- and -

SPERLING & SLATER
Paul E. Slater, Esquire
55 West Monroe
Suite 3200
Chicago, Illinois  60603
Tel:     (312) 641-3200
Fax:     (312) 641-6492
E-mail:  pes@sperling-law.com

- and -

3

VANEK, VICKERS & MASINI, P.C.
Joseph M. Vanek, Esquire
David P. Germaine, Esquire
55 West Monroe Street
Suite 3500
Chicago, Illinois  60603
Tel:   (312) 224-1500
Fax:   (312) 224-1510
E-mail: jvanek@vaneklaw.com
          dgermaine@vaneklaw.com

- and -

GRANT & EISENHOFER
Linda P. Nussbaum, Esquire
485 Lexington Avenue
29th Floor
New York, N.Y.  10017
Tel.:   (646) 722-8500
Fax:   (646) 722-8501
E-mail: lnussbaum@gelaw.com

- and -

STINSON LEONARD STREET LLP
David E. Everson, Esquire
1201 Walnut Street
Suite 2900
Kansas City, MO 64106
Tel:   (816) 842-8600
Fax:   (816) 412-1131
E-mail:  deverson@stinson.com

- and -

HANGLEY ARONCHICK SEGAL & PUDLIN
Eric L. Bloom, Esquire
4400 Deer Path Road
Suite 200
Harrisburg, PA 17110-3908
Tel:   (717) 364-1003
Fax:   (717) 364-1020
E-mail: ebloom@hangley.com

***Attorneys for Amici Curiae***

512060.1

4



Exhibit 1

1    Thomas S. Knox, Esquire
     KNOX, LEMMON & ANAPOLSKY, LLP
2    300 Capitol Mall
     Suite 1125
3    Sacramento, CA 95814
     Tel:   (916) 498-9911
4    Fax:   (916) 498-9991
     E-mail:  tknox@klalawfirm.com
5
     *Counsel for Amici Curiae*
6
     [See signature page for additional counsel for Amici Curiae]
7

8                        UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11   **ITALIAN COLORS RESTAURANT, ALAN**          2:14-cv-00604-MCE-DAD
     **CARLSON, LAURELWOOD CLEANERS,**
12   **LLC, JONATHAN EBRAHIMIAN, FAMILY**         **MEMORANDUM OF LAW OF AMICI**
     **LIFE CORPORATION d/b/a FAMILY**            **CURIAE CALIFORNIA RETAILERS**
13   **GRAPHICS, TOSHIO CHINO,**                  **ASSOCIATION, CALIFORNIA GROCERS**
                                                  **ASSOCIATION, SAFEWAY INC., THE**
14              **Plaintiffs,**                   **KROGER CO., WALGREEN CO.,**
                                                  **ALBERTSON'S LLC, HY-VEE, INC. AND**
15   **v.**                                       **RITE AID CORPORATION IN SUPPORT**
                                                  **OF PLAINTIFFS'MOTION FOR**
16   **KAMALA D. HARRIS, in her official**        **SUMMARY JUDGMENT**
     **capacity as Attorney General of the State of**
17   **California,**                              Date:        December 4, 2014
                                                  Time:        2:00 pm
18              **Defendant.**                    Courtroom:   7, 14th Floor
                                                  Judge:       Hon. Morrison C. England, Jr.
19                                                Trial Date:  None
                                                  Action Filed: March 5, 2014

20

21

22

23

24

25

26

27

28

**Table of Contents**

I.   Statement of Amici Curiae Interests .................................................................. 1

II.  Argument ........................................................................................................... 3

    A.   Merchant Discount Fees And The Lack of Price Competition...................... 3

    B.   The Persuasive Effect of Framing Price Differences as Surcharges Rather than Discounts ...................................................................................................... 5

    C.   It Furthers the Public's Interest in Competition to Allow Merchants to Describe a Price Difference as a Surcharge.................................................................... 6

    D.   The California Statute Unconstitutionally Restricts Freedom of Speech ...... 7

III. Conclusion .......................................................................................................... 9

MEMORANDUM OF LAW OF *AMICI CURIAE* IN SUPPORT
OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# Table of Authorities

**Cases**

*A.C.L.U. of Nevada v. City of Las Vegas,*
    466 F.3d 784 (9th Cir. 2006) ............................................................................. 8

*Bates v. State Bar of Ariz.,*
    433 U.S. 350 (1977).......................................................................................... 6

*Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York,*
    447 U.S. 557 (1980).......................................................................................... 7

*Nat'l Soc. of Prof'l Engineers v. United States,*
    435 U.S. 679 (1978).......................................................................................... 7

*Pruett v. Harris County Bail Bond Board,*
    499 F.3d 403 (5th Cir. 2007) ............................................................................. 9

*Thompson v. Western States Med. Ctr.,*
    535 U.S. 357 (2002)........................................................................................ 10

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976)................................................................................ 7, 9, 10

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
    471 U.S. 626 (1985).......................................................................................... 9

**Statutes**

Cal. Civ. Code § 1748.1.......................................................................................... 2

**Other Authorities**

Reserve Bank of Australia, "A Variation of the Surcharging Standards: Final Reforms and
    Regulation Impact Statement, June 2012 ............................................................ 5

Reserve Bank of Australia, Reform of Australia's Payment Systems: Preliminary Conclusions of the
    2007/08 Review, April 2008................................................................................ 5

MEMORANDUM OF LAW OF *AMICI CURIAE* IN SUPPORT
OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I.      Statement of Amici Curiae Interests

This memorandum of law is filed on behalf of the California Retailers Association, the California Grocers Association, Safeway Inc., The Kroger Co., Walgreen Co., Albertson's LLC, Hy-Vee, Inc. and Rite Aid Corporation.[1]

The California Retailers Association ("CRA") is the only statewide trade association representing all segments of the retail industry including general merchandise, department stores, mass merchandisers, fast food restaurants, convenience stores, supermarkets and grocery stores, chain drug, and specialty retail such as auto, vision, jewelry, hardware, and home stores.  CRA works on behalf of California's retail industry, which currently operates over 164,200 stores with sales in excess of $571 billion annually and employing 2,776,000 people – nearly one fifth of California's total employment.

The California Grocers Association ("CGA") is a non-profit, statewide trade association representing the food industry since 1898.  The CGA represents approximately 500 retail members operating over 6,000 food stores in California and Nevada, and approximately 300 grocery suppliers companies.  Retail membership includes chain and independent supermarkets, convenience stores, and mass merchandisers.  The CGA actively promotes and protects the legislative and regulatory interests of the retail food industry before Congress, the California State Legislature, local governments, and state and local regulatory agencies.

In addition to the CRA and the CGA, the Amici include large supermarket and drugstore chains that collectively have a nationwide presence, including substantial operations in California. Like most of the CRA's and CGA's members, each of these supermarket and drugstore chains accepts all major credit card brands,  and each of them pays a so-called merchant discount fee on every credit card transaction at its stores.  These are per-transaction fees paid by the merchants to the credit card companies.  These fees significantly increase a retailer's costs of operations.  In fact,

---

[1]      Amici state that: (A) this memorandum of law was authored entirely by counsel for the Amici and was not authored in any part by counsel for any party; (B) neither a party nor counsel for a party contributed any money intended to fund the preparation or submission of this memorandum; (C) no person or entity, other than the Amici and their counsel, contributed any money intended to fund the preparation or submission of this memorandum.

1

1  each of the supermarket and drugstore chain Amici pays millions of dollars every year in merchant

2  discount fees.   That cost increase must be recaptured by retailers in the form of higher prices

3  charged to consumers.   If retailers could clearly and effectively express to consumers the existence

4  and amount of the credit card fees they pay by unbundling the pricing and charge for the cost of

5  accepting a credit card, consumers would switch to lower-cost alternative payment forms and retail

6  prices would go down.

7          The California statute challenged in this action, Cal. Civ. Code § 1748.1,[2] prevents the

8  Amici and all other merchants from expressing in a particular way the existence of a price

9  difference between the use of credit cards and the use of other payment forms, such as cash, check

10  or debit card.   Thus, a California merchant is allowed to tell a consumer that he will pay a lower

11  price if he pays with cash, but the identical pricing behavior is a crime if the merchant tells the

12  consumer that he will pay a commensurately higher price if the consumer pays with a credit card.

13          The difference between these alternative descriptions of the same pricing behavior is

14  enormously important.   A fundamental precept of behavioral economics is the concept of "loss

15  aversion."   Loss aversion holds that an individual's response to a threatened loss (*i.e.*, a surcharge)

16  is far stronger than his or her response to a commensurate benefit (*i.e.*, a discount).   In other words,

17  if a merchant frames the difference between the price for using cash and the price for using a credit

18  card as a "surcharge" on the use of a credit card rather than as a "discount" of the same magnitude

19  for the use of cash, then the message is far more persuasive and will result in more people switching

20  from high-cost credit cards to alternative payment forms.   The label used – discount or surcharge –

21  should not legally matter as both is a price.   Discounting or surcharging is merely unbundling the

22  lower price or higher price, respectively, or accepting lower or higher cost payment means.   The

23  California statute does not prevent merchants from telling consumers that there is a price difference

24

25  _____
   [2]       Cal. Civ. Code § 1748.1 provides in relevant part: "No retailer in any sales, service,
26  or lease transaction with a consumer may impose a surcharge on a cardholder who elects to use a
   credit card in lieu of payment by cash, check, or similar means.   A retailer may, however, offer
27  discounts for the purpose of inducing payment by cash, check, or other means not involving the use
   of a credit card, provided that the discount is offered to all prospective buyers."

28
                                                    2

1  between the use of a credit card and cash.  It only prevents the merchant from expressing that

2  message in its most persuasive form.

3      The merchants want the opportunity to express to consumers a difference in price between

4  the use of credit cards and the use of alternative payment forms in the most persuasive and effective

5  manner possible.  The California statute bans that expression.  It does not prohibit conduct.

6      Some of the Amici have been at the forefront of the litigation challenging no-surcharge

7  restrictions.  They understand the impact that expressing a price difference as a surcharge has

8  played in reducing retailers' costs and consumers' prices in other countries.  They have expertise in

9  the benefits and persuasiveness of framing or unbundling prices as "surcharges" rather than

10  "discounts," and they can speak directly to why merchants should not be foreclosed from using the

11  language of "surcharge" to express their pricing decisions to California consumers.

## II.  Argument

### A.  Merchant Discount Fees And The Lack of Price Competition

14      Merchants incur "discount fees" on transactions paid for with a payment card.  Each year,

15  U.S. merchants pay more than $50 billion dollars in fees to the major credit card networks.  The

16  typical merchant discount fee on a credit card transaction in the U.S. is between 2% and 3% of the

17  transaction amount.  Fees on premium or reward cards are even higher.  This means that if a sales

18  ticket totals $100 and a customer pays with a credit card, the average amount received by the

19  merchant is only between $97 and $98.

20      In many industries, including those in which the Amici or their members participate,

21  merchant discount fees are among the highest line-item expenses incurred by a merchant.  Over the

22  years, these fees have increased dramatically.  From 2000 to 2006, the average cost of accepting

23  credit cards in the United States rose 123%.[3]  During approximately the same time period, merchant

24  discount fees declined outside of the United States.[4]  In countries where merchants have the ability

25  [3]      Elizabeth Warren, "Antitrust Issues in Credit Card Merchant Restraint Rules,"
26  Discussion Paper for the Tobin Project Risk Policy Working Group, May 6, 2007, p. 2.

27  [4]      Stuart E. Weiner and Julian Wright, "Interchange Fees in Various Countries:
   Developments and Determinants, "Federal Reserve Bank of Kansas City, Working Paper 05-01
   (September 6, 2005), p. 14.

28

3

to frame a price increase as a discrete surcharge imposed only on consumers who present high-cost payment cards, the merchant discount fees are significantly less than they are in the U.S.[5]  For example, in the decade since the Reserve Bank of Australia removed the ban on merchants surcharging credit card use, unregulated credit card discount fees dropped on average from approximately 2.5% to roughly 1.8%.[6]  U.S. rates, however, did not drop over the same period of time.

Prior to about a year ago, U.S. merchants were denied the tools needed to incentivize MasterCard and Visa to compete against each other on price and reduce their merchant discount rates.  More specifically, merchants were precluded by the MasterCard and Visa "no surcharge" rules from using ordinary price signals to direct customers to lower-cost payment forms.  Some of the Amici and other U.S. merchants fought long and hard to have those rules rescinded as illegal restraints on price competition.  The merchants argued that if they could impose a surcharge on high-cost credit cards that consumers would switch to lower-cost alternative payment forms.  The credit card companies would then have to become more competitive with lower cost alternative payment forms or face the loss of transactional volume that would result from their comparatively high prices.

In early 2013, after eight years of litigation, MasterCard and Visa agreed to eliminate their no-surcharge rules.  However, for California merchants, the no-surcharge statute may still preclude them from using the simplest and most efficacious price signal – a surcharge – to direct purchasers to lower-cost payment forms.

---

[5]    In no fewer than twenty countries including Australia, Spain and the United Kingdom, public authorities have taken legal or administrative action to ensure that merchants have the right to surcharge credit card transactions. Fumiko Hayashi, "Public Authority Involvement in Payment Card Markets: Various Countries, August 2012 Update," Payment Systems Research Department, Federal Reserve Bank of Kansas City, pp. 9-10.

[6]    RBA, Table C2, Market Shares of Credit and Charge Card Schemes, http://www.rba.gov.au/payments-system/resources/statistics/index.html (file "C3: Average Merchant Fees for Debit, Credit and Charge Card" showing decrease in American Express average merchant fees, which are not subject to price regulation in Australia).

4

The California no-surcharge law thus steps into the shoes of the now abandoned anticompetitive rules of Visa and MasterCard. This no-surcharge law prohibits merchants from communicating transparent and informative surcharge price signals to consumers so as to persuade them to switch from credit cards to less expensive payment forms, like cash or debit cards. The law thereby shields credit card companies from having to engage in the horizontal price competition that would result from the use of such price signals.

**B.     The Persuasive Effect of Framing Price Differences as Surcharges Rather than Discounts**

Under the California no-surcharge statute, the speech by which a merchant can communicate a price difference between the use of high-cost credit cards and lower-cost alternative payment forms, such as cash or debit cards, is constrained. The merchant is allowed to express the difference as a discount given for using the lower-cost payment form, but is not allowed to express the price difference as a surcharge imposed on the higher-cost credit card.

There can be no credible debate about the strength and persuasiveness of the messaging when a price difference is communicated as a surcharge rather than a discount. When consumers face even a small surcharge for using a credit card, they shift to a different, non-surcharged payment product. The shift is dramatic and immediate. Empirical evidence from Australia, where credit card surcharging is permissible, shows that a majority of consumers faced with a small surcharge will switch to a non-surcharged product.[7] Likewise, an empirical study submitted by MasterCard in proceedings before the United Kingdom's Office of Fair Trading found that the imposition of a 2% surcharge on customers who use a credit card to buy groceries shifted 55% to 71% of the sales volume away from credit cards to alternative payment methods.[8]

---

[7]     Reserve Bank of Australia, "A Variation of the Surcharging Standards: Final Reforms and Regulation Impact Statement, June 2012, p. 3.

[8]     Investigation of the multilateral interchange fees provided for in the UK domestic rules of MasterCard UK Members Forum Limited (formerly known as MasterCard/Europay UK limited), Decision of the Office of Fair Trading, Sept. 5, 2005, p. 76. *See also* Reserve Bank of Australia, Reform of Australia's Payment Systems: Preliminary Conclusions of the 2007/08 Review, April 2008, p. 18 ("[W]hen surcharges are imposed on a particular type of card, use of that card declines substantially").

5

Behavioral economics explains the power of a price difference denominated as a surcharge through the doctrine of "loss aversion" – which is "the empirically demonstrated tendency for people to weigh losses significantly more heavily than gains."[9]   In other words, an economic transaction that is framed as the loss of one dollar has a far greater motivating effect than a transaction that is framed as the gain of one dollar.[10]   As a result, a discount given to a consumer for using an alternative payment form must be of significantly greater magnitude than a surcharge imposed on the use of a credit card in order to achieve an equivalent shift in purchaser behavior.[11] Due to the operation of loss aversion, a price difference framed as a 2% surcharge (*i.e.*, a loss) on the use of credit cards is a far more persuasive and motivating price signal than a price difference that is framed as a 2% discount (*i.e.*, a gain) on the use of alternative payment forms such as cash or debit cards.

A useful example of loss aversion was described in the research of Dutch economists on consumers' attitudes toward credit card surcharges and cash discounts.   The research found that 74% of the consumers surveyed had a negative or strongly negative association with credit card surcharges while only 22% of the sample had a positive or strongly positive view of a cash discount.[12]

**C.    It Furthers the Public's Interest in Competition to Allow Merchants to Describe a Price Difference as a Surcharge**

The restriction on merchants' ability to use the language of surcharging to describe a price difference is contrary to both the First Amendment and the public interest in price competition. The

---

[9]    Richard H. Thaler and Shlomo Bernartzi, "Save More Tomorrow™: Using Behavioral Economics to Increase Employee Saving," Journal of Political Economy, Vol. 112, No. S1:S164-S187 at S169 (February 2004) ("Thaler and Bernartzi (2004)").

[10]    *See*, *e.g.*, Edmund W. Kitch, "The Framing Hypothesis: Is It Supported by Credit Card Issuer Opposition to a Surcharge on a Cash Price," Journal of Law, Economics and Organization, Vol. 6, No. 1:217-233 at 218, n.2 (Spring 1990).

[11]    E. Vis and J. Toth, "The Abolition of the No-Discount Rule," Project No. R231 (March 2000), pp. 11-12 ("Vis and Toth").

[12]    E. Vis and J. Toth, p. 15.

6

1  Supreme Court has recognized that commercial speech is critically important not only to speakers

2  and listeners, but also to the functioning of a free economy. *Bates v. State Bar of Ariz.*, 433 U.S.

3  350, 364 (1977) (commercial speech "performs an indispensible role in the allocation of resources

4  in a free enterprise system"). Clearly, the "heart of our national economy long has been faith in the

5  value of competition." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978).

6  This is because "competition will produce not only lower prices, but also better goods and

7  services." *Id.*

8       Here, the prohibition on the use of the term "surcharge" prevents merchants from using the

9  more powerful and effective price signal to incentivize consumers to switch to lower-cost

10  alternative payment services. If the providers of high-cost credit card services lose transactional

11  volume due to their high merchant discount fees and resulting surcharges on the use of credit cards,

12  they will have to compete with the alternative payment forms on price or face the competitive

13  consequences of their failure to do so. Specifically, the credit card providers will have to lower

14  their merchant discount fees or lose sales volume to lower-priced alternatives. It is in the public

15  interest to allow merchants to use the strongest tools available to maximize this price competition so

16  as to minimize price and maximize quality.

17       In addition, the California statute fundamentally interferes with price transparency and the

18  efficient functioning of the market. In an efficient market, prices convey information to the

19  consumer as to the value and cost of goods and services. The no-surcharge law thwarts that

20  function. It prevents merchants from using price to inform customers of the relative cost to the

21  merchant of their chosen means of payment. The elimination of such pricing information all but

22  guarantees an inefficient allocation of resources. The market's 'invisible hand' cannot function

23  when buyers are not provided with appropriate information and incentives to guide their decisions.

24       **D.     The California Statute Unconstitutionally Restricts Freedom of Speech**

25       The Supreme Court has recognized that the dissemination of price signals is an essential

26  form of commercial speech. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer*

27  *Council, Inc.*, 425 U.S. 748, 764-65 (1976) (commercial speech including the dissemination of

28

7

1    "price information" to consumers "is protected by the First Amendment"); *Central Hudson Gas &*

2    *Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 580 (1980) (Stevens, J.,

3    concurring) (commercial speech includes "a manufacturer's publication of a price list"). A rule that

4    bans the use of price signals bans the use of speech. Under the First Amendment, content-based

5    speech restrictions are "presumptively unconstitutional." *A.C.L.U. of Nevada v. City of Las Vegas,*

6    466 F.3d 784, 792 (9th Cir. 2006). As explained below, the California statute does not regulate

7    conduct. It regulates only the content of the speech and the words that are used to describe the

8    pricing conduct in question. More specifically, the California statute does not restrict the prices

9    charged by a merchant. It restricts what the merchant says about those prices and whether the

10   merchant describes a price difference, equal in amount, as a surcharge or a discount.

11        Assume, for example, that a widget is being sold for the stated price of $1.00. If the

12   merchant grants a two-cent discount only to cash customers, those customers pay $0.98 and credit

13   card customers pay $1.00. Now assume that the merchant expresses his price as $0.98 and imposes

14   a two-cent surcharge on credit card customers. The economic transaction and the pricing behavior

15   is identical. In both cases, the cash customer pays $0.98 and the credit card customer pays $1.00.

16   The only difference is the manner in which the transaction is described. In one case the transaction

17   is described as a two-cent discount to cash customers. In the other case, the transaction is described

18   as a two-cent surcharge on credit cards. In making the surcharge description a criminal offense, the

19   California statute does not punish the pricing conduct or the transaction. It punishes only the

20   manner in which the transaction is described. It punishes pure speech. This impropriety is

21   compounded by the fact that the speech that is punished (*i.e.,* surcharging) is the most effective

22   form of price signaling and, due to the doctrine of loss aversion, has the most persuasive and

23   motivating effect on its audience. If the California statute addressed political speech, it would allow

24   campaign statements that are relatively ineffective, but ban campaign statements that cause voters to

25   change the way they vote.

26        The State no-surcharge law also ensures that high merchant discount fees are hidden from

27   consumers. Amici have a strong interest in providing or their customers with accurate information

28

8

1    regarding the cost to the merchant of various payment products, and the most powerful way to

2    convey that information is via a price signal that shows a higher charge for the higher-cost payment

3    form.  Armed with accurate price signals, consumers can make appropriate choices.  Indeed, the

4    right of consumers to receive accurate information is a core value in the Supreme Court's

5    commercial speech jurisprudence: "[T]he extension of First Amendment protection to commercial

6    speech is justified principally by the value to consumers of the information such speech

7    provides . . . ."  *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S.

8    626, 651 (1985); *Virginia Bd. of Pharmacy*, 425 U.S. at 757 (Just as advertisers have a First

9    Amendment right to distribute advertising, consumers have a "reciprocal right to receive the

10   advertising"); *Pruett v. Harris County Bail Bond Bd.*, 499 F.3d 403, 415 n.35 (5th Cir. 2007) ("The

11   benefits attending commercial speech flow not just to the speaker, for increased consumer

12   knowledge about any product aids consumer choice and increases competition.")  Moreover, as the

13   Court noted in *Virginia Board of Pharmacy,* consumers' interest in receiving commercial

14   information "may be as keen, if not keener by far, than his interest in the day's most urgent political

15   debate."  425 U.S. at 763.  By prohibiting merchants from using the speech of surcharging, the

16   California statute impermissibly prevents the consumers from receiving clear, concise and

17   persuasive price signals.

**III.    Conclusion**

19          California allows merchants to charge a different and lower price when consumers use a

20   lower-cost payment form such as cash or a debit card – so long as the merchant does not call the

21   price difference a surcharge on the higher-cost credit cards.  Merchants should be able to speak

22   transparently and openly with their customers and communicate clearly and effectively that they are

23   increasing the price when a consumer uses a high-cost credit card.  Free speech requires no less, and

24   the augmentation of price competition is an added benefit.

25          When the dominant credit card networks banned surcharging they had a discernible (if not

26   admitted) objective: to insulate themselves from competitive forces and allow themselves to set

27   merchant fees at rates that would be unthinkable in much of the world.  The objective of the

28

9

California legislature, however, is less clear.  Perhaps, the legislature was concerned that consumers would make bad decisions if they received accurate price signals.  The Supreme Court, however, has rejected restrictions on commercial speech based on the "fear that people would make bad decisions if given truthful information," *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 374 (2002); *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S 748,  770 (1976) ("people will perceive their own best interests, if only they are well enough informed, and … the best means to that end is to open the channels of communication rather than to close them.  It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us.")

For all the foregoing reasons, and those set forth in the Plaintiffs' motion for summary judgment, Amici respectfully submit that the Court should grant the Plaintiffs' motion for summary judgment.

Dated:   Sacramento, CA
             November 10, 2014

Respectfully submitted,

Thomas S. Knox, Esquire
KNOX, LEMMON & ANAPOLSKY, LLP
300 Capitol Mall
Suite 1125
Sacramento, CA 95814
Tel:    (916) 498-9911
Fax:    (916) 498-9991
E-mail: tknox@klalawfirm.com


By:   ___/s/_____

- and -

KENNY NACHWALTER, P.A.
Richard Alan Arnold, Esquire
William J. Blechman, Esquire
James Almon, Esquire
201 S. Biscayne Boulevard
Suite 1100
Miami, Florida  33131-4327
Tel:    (305) 373-1000
Fax:    (305) 372-1861
E-mail:  rarnold@knpa.com
             wblechman@knpa.com
             jalmon@knpa.com

10

- and -

SPERLING & SLATER
Paul E. Slater, Esquire
55 West Monroe
Suite 3200
Chicago, Illinois  60603
Tel:    (312) 641-3200
Fax:    (312) 641-6492
E-mail:  pes@sperling-law.com

- and -

VANEK, VICKERS & MASINI, P.C.
Joseph M. Vanek, Esquire
David P. Germaine, Esquire
55 West Monroe Street
Suite 3500
Chicago, Illinois  60603
Tel:    (312) 224-1500
Fax:    (312) 224-1510
E-mail:  jvanek@vaneklaw.com
        dgermaine@vaneklaw.com

- and -

GRANT & EISENHOFER
Linda P. Nussbaum, Esquire
485 Lexington Avenue
29th Floor
New York, N.Y.  10017
Tel.:    (646) 722-8500
Fax:    (646) 722-8501
E-mail:  lnussbaum@gelaw.com

- and -

STINSON LEONARD STREET LLP
David E. Everson, Esquire
1201 Walnut Street
Suite 2900
Kansas City, MO 64106
Tel:    (816) 842-8600
Fax:    (816) 412-1131
E-mail:  deverson@stinson.com

- and -

11

HANGLEY ARONCHICK SEGAL & PUDLIN
Eric L. Bloom, Esquire
4400 Deer Path Road
Suite 200
Harrisburg, PA 17110-3908
Tel:     (717) 364-1003
Fax:     (717) 364-1020
E-mail: ebloom@hangley.com

***Attorneys for Amici Curiae***

512056.1

12