Benjamin D. Brown (#202545)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
bbrown@cohenmilstein.com

*Counsel for Amici Curiae*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ITALIAN COLORS RESTAURANT, ALAN CARLSON, LAURELWOOD CLEANERS, LLC, JONATHAN EBRAHIMIAN, FAMILY LIFE CORPORATION d/b/a FAMILY GRAPHICS, TOSHIO CHINO,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**KAMALA D. HARRIS, in her official capacity as Attorney General of the State of California,**<br><br>**Defendant.** | 2:14-cv-00604-MCE-DAD<br><br>**MOTION OF AMICI CURIAE CONSUMER ACTION, NATIONAL ASSOCIATION OF CONSUMER ADVOCATES, NATIONAL CONSUMERS LEAGUE, AND U.S. PUBLIC INTEREST RESEARCH GROUP FOR LEAVE TO FILE A BRIEF AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:         December 4, 2014<br>Time:         2:00 pm<br>Courtroom:   7, 14th Floor<br>Judge:        Hon. Morrison C. England, Jr.<br>Trial Date:   None<br>Action Filed: March 5, 2014 |

Movants Consumer Action, National Association of Consumer Advocates, National Consumers League, and U.S. Public Interest Research Group ("movants") hereby request leave to file with this Court a memorandum as amici curiae in support of the Plaintiffs' motion seeking a preliminary injunction.  Counsel for Plaintiffs and the State of California have informed us that they do not oppose this motion.

The purpose of the proposed brief is to assist the Court in understanding the true effects of the no-surcharge rule – purportedly a consumer-protection measure – on consumers and competition.  Cal. Civ. Code § 1748.1.  Movants' proposed brief offers a vital, unrepresented perspective that will aid the Court in assessing the far-reaching consequences of this case.  Moreover, rather than offering information merely of interest as background, the proposed brief will provide facts critical to the Court's application of the legal standards for commercial speech restrictions.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).  Because the relevant legal analysis calls for the Court to evaluate the substance and efficacy of the government action in light of its policy aims, an amicus brief from those the policy is said to protect, offering facts about its true impact, is uniquely appropriate.  This Court should grant here leave because "the amicus has unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide."  *Missouri v. Harris*, No. 2:14-cv-00341-KJM-KJN, 2014 WL 2987284, at *2 (E.D. Cal. July 1, 2014) (quoting *Cmty. Ass'n for Restoration of Env't (CARE) v. DeRuyter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999)).

Movants have broad knowledge and decades of experience advocating for consumers and are particularly well qualified to assist the Court in understanding the substantial public interest advanced by the challenge to the no-surcharge rule.  The identities and interests of the movants are as follows:

1

**Consumer Action** has been educating consumers on credit card related matters, including credit card surcharges, for more than four decades. Consumer Action has been a champion of underrepresented consumers since 1971.   A national, nonprofit 501(c)3 organization, Consumer Action focuses on financial education that empowers low to moderate income and limited-English-speaking consumers to financially prosper.   It also advocates for consumers in the media and before lawmakers to advance consumer rights and promote industry-wide change, particularly in the fields of credit, banking, housing, privacy, insurance and utilities.

The **National Association of Consumer Advocates** (NACA) is a non-profit corporation whose members are private and public sector attorneys, legal services attorneys, law professors, and law students whose primary focus involves the protection and representation of consumers. NACA's mission is to promote justice for all consumers by maintaining a forum for information sharing among consumer advocates across the country and serving as a voice for its members as well as consumers in the ongoing effort to curb unfair and abusive business practices.

The **National Consumers League** is America's oldest consumer organization, representing consumers and workers on marketplace and workplace issues since its founding in 1899. NCL provides government, businesses, and other organizations with the consumer's perspective on a wide range of concerns, including the cost of payment systems.

**U.S. Public Interest Research Group (U.S. PIRG)**, the federation of state Public Interest Research Groups, is a national, nonprofit, non- partisan consumer advocacy organization that stands up to powerful special interests on behalf of the American public.   U.S. PIRG has long advocated on the issue of swipe-fee reform.   U.S. PIRG believes that cash customers should not pay more to subsidize credit card reward programs and supports efforts to make the costs of credit transparent to consumers.

The proposed amicus brief would both offer the consumer prospective on the case at hand,

2

and provide information critical to the Court's application of the relevant legal standards. As would be explained more fully in the proposed amicus brief, the no-surcharge rule has broad implications for all consumer transactions, and was initially justified as a consumer-protection measure. *See* Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1379–84 (2008) (discussing historical attempts by the credit card lobby to paint no-surcharge rules as pro-consumer over the objections of major consumer groups).  Yet neither party to this action is in a position to provide the Court with a disinterested assessment of the rule's true impact on consumers or competition.

Because the case at issue is a First Amendment speech case, the Court's legal analysis will turn on the policy issues addressed in the proposed brief. Specifically, this Court must determine, inter alia, "whether the asserted governmental interest [justifying the restraint of speech] is substantial . . . . whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Cent. Hudson Gas*, 447 U.S. at 566.  The proposed brief would aid the Court in assessing to what degree – if at all – the no-surcharge rule serves the asserted government interest, and the availability of less extensive means to achieve the same purpose.  *See Edenfield v. Fane*, 507 U.S. 761, 768 (1993) ("Neither will we turn away if it appears that the stated interests are not the actual interests served by the restriction."). In some cases, advocacy groups and interested parties may seek to use amicus briefs to shoehorn policy considerations into cases where public policy is not strictly relevant to the legal determinations before the court. This is not such a case. The legal test will require an evaluation of a policy that supposedly benefits consumers, and therefore movants are uniquely positioned to provide the Court with information directly relevance to the issues before it.

## CONCLUSION

For the foregoing reasons, movants respectfully seek this Court's leave to file a brief as amici curiae.

Dated:  November 19, 2014                    Respectfully submitted,

                                    By:   /s/ Benjamin D. Brown
                                          Benjamin D. Brown
                                          Cohen Milstein Sellers & Toll PLLC
                                          1100 New York Ave NW Suite 500 East
                                          Washington, DC 20005
                                          Telephone: (202) 408-4600
                                          *bbrown@cohenmilstein.com*

                                          ***Counsel for Amici Curiae***

4

# PROOF OF SERVICE

I, Benjamin D. Brown, counsel for the amici curiae, hereby certify that the following document(s): Motion of Amici Curiae Consumer Action, National Association of Consumer Advocates, National Consumers League, and U.S. Public Interest Research Group for Leave to File a Brief as Amici Curiae in Support of Plaintiffs' Motion for a Preliminary Injunction and this certificate of service were served on November 19, 2014 via ECF on the interested parties in this action.

/s/ Benjamin D. Brown
Benjamin D. Brown
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave NW Suite 500 East
Washington, DC 20005
Telephone: (202) 408-4600
*bbrown@cohenmilstein.com*

***Counsel for Amici Curiae***

# EXHIBIT A

1  Benjamin D. Brown (#202545)
   COHEN MILSTEIN SELLERS & TOLL PLLC
2  1100 New York Ave. NW
   Suite 500, West Tower
3  Washington, DC 20005
   Telephone:  (202) 408-4600
4  bbrown@cohenmilstein.com

5  *Counsel for Amici Curiae*

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **EASTERN DISTRICT OF CALIFORNIA**

10

11                                          | 2:14-cv-00604-MCE-DAD

12  **ITALIAN COLORS RESTAURANT,**          | **BRIEF FOR AMICI CURIAE CONSUMER**
                                            | **ACTION, NATIONAL ASSOCIATION OF**
13  **ALAN CARLSON, LAURELWOOD**            | **CONSUMER ADVOCATES, NATIONAL**
    **CLEANERS, LLC, JONATHAN**             | **CONSUMERS LEAGUE, AND U.S. PUBLIC**
14  **EBRAHIMIAN, FAMILY LIFE**             | **INTEREST RESEARCH GROUP IN SUPPORT**
    **CORPORATION d/b/a FAMILY**            | **OF PLAINTIFFS' MOTION FOR SUMMARY**
15  **GRAPHICS, TOSHIO CHINO,**             | **JUDGMENT**

16            **Plaintiffs,**              | Date:        December 4, 2014
                                            | Time:        2:00 pm
17  **v.**                                  | Courtroom:   7, 14th Floor
                                            | Judge:       Hon. Morrison C. England, Jr.
18                                          | Trial Date:  None
19  **KAMALA D. HARRIS, in her official**
    **capacity as Attorney General of the State of** Action Filed:  March 5, 2014
20  **California,**

21            **Defendant.**

22

23

24

25

26

27

28

1

## CORPORATE DISCLOSURE STATEMENT

2

3
Consumer Action, National Association of Consumer Advocates, National Consumers

4
League, and U.S. Public Interest Research Group, by and through their undersigned counsel, hereby

5
certify that they have no parent corporation and that no publicly held corporation owns 10% or more

6
of their stock.

7

## STATEMENT OF CONSENT TO FILE AMICUS

8

9
I, Benjamin D. Brown, am admitted to practice in this Court and have obtained consent from

10
all parties to submit this Amicus Curiae brief in support of Plaintiffs' motion.

11

12

13
/s/ Benjamin D. Brown
Benjamin D. Brown

14
COHEN MILSTEIN SELLERS &
TOLL PLLC

15
1100 New York Ave, NW, Suite 500
Washington, DC 20005

16
(202) 408-4600

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

INTERESTS OF AMICI ................................................................................................ 2

BACKGROUND .......................................................................................................... 3

ARGUMENT ............................................................................................................... 4

    I.     THE NO-SURCHARGE LAW FORCES MERCHANTS TO RECOUP
           SUPRA-COMPETITIVE INTERCHANGE FEES BY RAISING STICKER
           PRICES FOR ALL CONSUMERS. ........................................................... 4

    II.    THE CROSS SUBSIDIES CREATED BY THE NO-SURCHARGE LAW
           ARE HIGHLY REGRESSIVE. ................................................................. 9

    III.   THE STATE'S JUSTIFICATION FOR THE LAW, AVOIDING
           MISLEADING AND DECEPTIVE PRACTICES, DOES NOT SURVIVE
           SCRUTINY AND ALTERNATIVE, LESS RESTRICTIVE MEANS ARE
           READILY AVAILABLE TO PROTECT CONSUMERS FROM
           POTENTIAL MERCHANT ABUSES WITHOUT HARMING
           COMMERCE. ...................................................................................... 11

    IV.   THE EXISTENCE OF NETWORK EFFECTS DOES NOT JUSTIFY THE
           NO-SURCHARGE LAW. ...................................................................... 12

         A.   Benefits to Consumers In Other Networks, Like Debit Card Users,
                Along With Reduction in Interchange Fees, Will More than Offset the
                Welfare Costs of Decreased Credit Card Usage. ..................................... 13

         B.   Overconsumption of Credit Card Debt Causes Uniquely Harmful
                Social Externalities. ........................................................................ 15

CONCLUSION.............................................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bates v. State Bar of Ariz.*,
    433 U.S. 350 (1977)....................................................................8, 9, 11, 14

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
    986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...................................................12

*People v. Fulvio*,
    517 N.Y.S.2d 1008 (Crim. Ct. N.Y. 1987) ............................................6

*Thompson  v. Western States Medical Center*,
    537 U.S. 397 (1989)...............................................................................14

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) ....................................................6

STATUTES

Cal. Civ. Code §1741.1 ......................................................................................3

OTHER REFERENCES

108th Cong. 115 (2004) .....................................................................................7

Adam J. Levitin, *The Antitrust Superbowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit,* BERK. BUS. L. J. 69 (2006)............................................ *passim*

Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. REV. 1321 (2008) .........................................................................7

Adam J. Levitin,  *Priceless? The Social Costs of No-Surcharge Rules*, Business, Economics and Regulatory Policy Working Paper Series No. 973974 (Jan. 2008 Revision)......................5

Andrew Ching & Fumiko Hayashi, FEDERAL RESERVE BANK OF KANSAS CITY, *Payment Card Rewards Programs and Consumer Payment Choice,* Working Paper No. 06-02 (2006) ..................................................................................................10

Andrew Martin, *Card Fees Pit Retailers Against Banks,* N.Y. TIMES (Jul. 15, 2009) ...................5

Associated Press, *Consumers Take on More Debt*, N.Y. TIMES (Jul. 9, 2012),.............................15

Burney Simpson, *Merchants Tackle Credit Card Fee Policies,* CARDS & PAYMENTS (Jan. 2006) ......................................................................................................9

*Cash Discount Act, 1981: Hearings on S. 414 Before the Senate Banking Comm.*, 97th Cong., 1st Sess. 10 (Feb. 18, 1981) .........................................................12

iii

Council Directive 98/6, art. 3, 1998 O.J. (L 80) (EC) ................................................12

David S. Evans & Richard Schmalensee, INTERCHANGE FEES IN CREDIT AND DEBIT CARD
  INDUSTRIES, PROCEEDINGS OF THE 2005 FEDERAL RESERVE BANK OF KANSAS CITY
  CONFERENCE, *The Economics of Interchange Fees and Their Regulation: An Overview*
  (2005)................................................................................................................5, 13

Efraim Berkovich, *Card Rewards and Cross-Subsidization in the Gasoline and Grocery
  Markets*, REV. OF NETWORK ECON. (2012)...........................................................10

Elizabeth Warren, *Antitrust Issues in Credit Card Merchant Restraint Rules*, Tobin Project
  Risk Policy Working Group (May 6, 2007)..............................................2, 4, 7, 9

Fumiko Hayashi, FEDERAL RESERVE BANK OF KANSAS CITY, *Discounts and Surcharges:
  Implications for Consumer Payment Choice* (June 2012) ..........................................1

General Court of the European Union, Case T-11/08, *Mastercard Inc. v. Comm'n* (2012) ............6

James J. Daly*, Tenuous Gains in Card Profitability*, CREDIT CARD MGMT., May 2001 ..............5

Jeffrey Green, *Exclusive Bankcard Profitability 2007 Study & Annual Report*, CARDS &
  PAYMENT 27 (May 2007)..........................................................................................5

John M. Barron et al*., Discounts for Cash in Retail Gasoline Marketing*, 10 CONTEMP. ECON.
  ISSUES 89 (1992) .....................................................................................................7

Jonathan Zinman, *Debit or Credit* (Dartmouth University Press Unpublished Manuscript)
  (Aug. 2007) ...........................................................................................................13

Joseph Farrell, *Efficiency and Competition Between Payment Instruments,* 5 REV. NETWORK
  ECON. 26 (2006)....................................................................................................14

Keith Bradsher, *U.S. Looks to Australia on Credit Card Fees*, N.Y. TIMES (Nov. 24, 2009)........5

Meg Handly, *Consumers Still Buried In Credit Card Debt*, U.S. News and World Report
  (Mar. 12, 2012). ....................................................................................................15

Meta Brown et al., FEDERAL RESERVE BANK OF NEW YORK, *Do We Know What We Owe? A
  Comparison of Borrower- and Lender-Reported Consumer Debt* (Oct. 2011).....................15

Molotsky, *Extension of Credit Surcharge Ban*, N.Y. TIMES, Feb. 29, 1984 ................................11

Oren Bar-Gill, *Seduction by Plastic,* 98 Nw. U. L. Rev. 1373 (2004) ........................................15

Scott Schuh et al., FEDERAL RESERVE BANK OF BOSTON, *Who Gains and Who Loses from
  Credit Card Payments?* (2010) ..............................................................6, 7, 10

S. Rep. No. 97023 (1981) ...........................................................................................12

iv

Steven Semeraro, *The Antitrust Economics (and Law) of Surcharging Credit Card Transactions*, 14 STAN. J.L. BUS. & FIN. 343 (2009)................................................8

Stuart E. Weiner & Julian Wright, *Interchange Fees in Various Countries: Developments and Determinants* ...........................................................................................................14

Teresa A. Sullivan, Elizabeth Warren, Jay Lawrence Westbrook , *Credit Cards*, THE FRAGILE MIDDLE CLASS: AMERICANS IN DEBT, Yale University Press (2000).....................................15

Terri Bradford & Fumiko Hayashi, FEDERAL RESERVE BANK OF KANSAS CITY PAYMENTS SYSTEM RESEARCH BRIEFING, *Developments in Interchange Fees In the United States and Abroad*, (Apr. 2008)......................................................................................................14

William C. Dunkelberg & Robert H. Smiley, *Subsidies in the Use of Revolving Credit*, 7.4 J. MONEY CREDIT & BANKING 477 (1975)......................................................................9, 14

Zhu Wang, *Market Structure and Credit Card Pricing: What Drives Interchange?*, 28 INT'L J. OF INDUS. ORG. 86 (2010)...................................................................................8, 13

**PRELIMINARY STATEMENT**

The plaintiff merchants in this case are seeking an injunction against the enforcement of California's no-surcharge law, California Civil Code section 1748.1.  This law allows merchants to directly pass on the cost of credit card swipe fees to consumers by charging different prices depending on whether a consumer pays with cash or credit—but only if the merchants frame the price difference as the credit card industry wants them to: "discounts" for cash are allowed, equivalent "surcharges" for credit are not.

The way this price difference is framed matters, however, because "[b]ehavioral economics explains that consumers are more sensitive to a loss than to a gain."  Fumiko Hayashi, FEDERAL RESERVE BANK OF KANSAS CITY, *Discounts and Surcharges: Implications for Consumer Payment Choice*, 2 (June 2012).  "In the context of consumer payment choice," consumers "react more strongly to surcharges than to discounts," meaning that discounts "have a smaller impact on payment behavior than surcharges of the same value."  *Id.*  By requiring merchants to label any price difference as a cash "discount" rather than a credit "surcharge," California's no-surcharge law prohibits them from effectively communicating the cost of credit to their customers—and thus furthers the credit card industry's goal of keeping consumers in the dark about how much they pay for credit.  Moreover, because merchants are afraid of crossing the line between discounts and surcharges, the law in practice deters most merchants from engaging in differential pricing altogether.  For reasons discussed more fully below, that is an especially bad outcome for consumers.

Amici curiae are national consumer advocacy organizations that support the injunction and file this brief to make four primary points.  *First*, the California no-surcharge law results in supra-competitive interchange fees that, as a practical matter, merchants are forced to recoup by raising prices for all consumers.  *Second*, the no-surcharge law results in highly regressive cross subsidies of

high cost credit cards and rewards programs by other consumers—which, "[i]n the most extreme terms, . . . mean that first-class upgrades from frequent flier miles are subsidized by food stamp recipients." Elizabeth Warren, *Antitrust Issues in Credit Card Merchant Restraint Rules*, Tobin Project Risk Policy Working Group, 1 (May 6, 2007), *available at* http://www.docstoc.com/docs/26252409/Antitrust-Issues-in-Credit-Card-Merchant-Restraint-Rules. *Third*, less restrictive means—in the form of disclosure requirements rather than speech codes—are available to protect consumers from potential merchant abuses. *Fourth*, none of the proffered justifications for the law stands up to scrutiny.

### INTERESTS OF AMICI

Amici curiae are four leading consumer advocacy groups whose decades of collective experience advocating for consumers make them qualified to assist the Court in understanding the substantial public interest advanced by the challenge to the no-surcharge law. Amici have broad knowledge about the history of credit cards and are particularly well qualified to assist the Court in understanding how the public interest, and consumer interests in particular, are undermined by the challenged statute, which was originally advanced by the credit card industry, and by similar statutes that are being introduced by and lobbied for by the industry in various other states on an ongoing basis.

**Consumer Action** has been educating consumers on credit card related matters, including credit card surcharges, for more than four decades. Consumer Action has been a champion of underrepresented consumers since 1971. A national, nonprofit 501(c)3 organization, Consumer Action focuses on financial education that empowers low to moderate income and limited-English-speaking consumers to financially prosper. It also advocates for consumers in the media and before lawmakers to advance consumer rights and promote industry-wide change particularly in the fields of credit, banking, housing, privacy, insurance and utilities.

**National Association of Consumer Advocates** (NACA) is a non-profit corporation whose members are private and public sector attorneys, legal services attorneys, law professors, and law students whose primary focus involves the protection and representation of consumers.  NACA's mission is to promote justice for all consumers by maintaining a forum for information sharing among consumer advocates across the country and serving as a voice for its members as well as consumers in the ongoing effort to curb unfair and abusive business practices.

**National Consumers League** is America's oldest consumer organization, representing consumers and workers on marketplace and workplace issues since its founding in 1899.  NCL provides government, businesses, and other organizations with the consumer's perspective on a wide range of concerns, including the cost of payment systems.

**U.S. Public Interest Research Group (U.S. PIRG)**, the federation of state Public Interest Research Groups, is a national, nonprofit, non- partisan consumer advocacy organization that stands up to powerful special interests on behalf of the American public.  U.S. PIRG has long advocated on the issue of swipe-fee reform.  U.S. PIRG believes that cash customers should not pay more to subsidize credit card reward programs and supports efforts to make the costs of credit transparent to consumers.

## BACKGROUND

California's no-surcharge law provides that "no retailer in any sales, service or lease transaction with a consumer may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means" and  subjects merchants to treble damages plus attorneys fees and costs for any violations.  Cal. Civ. Code §1741.1.  This law, and others like it, effectively deprives merchants of a valuable tool that could otherwise be utilized to help remedy the grossly inefficient and anticompetitive system of payment that now drastically and detrimentally affects American consumers.

3

American consumers pay the highest interchange fees in the world, fees that are many times higher than the fees paid by consumers in most other developed countries. These excessive fees are passed on to consumers in the form of higher retail prices on the goods and services they purchase every day. The main reason that there is not more awareness and outcry about this issue is that those fees are hidden from consumers because merchants are effectively prevented from instituting pricing structures that reflect those fees in the form of discounts or surcharges. Importantly, "no surcharge" rules do not prevent merchants from passing on the costs of these supra-competitive fees. They only prevent merchants from passing on those costs in a sensible manner more closely tied to the actual use of credit cards and in a manner that could introduce price competition among payment systems. The results are higher general retail prices and higher interchange fees. This also eliminates an important mechanism that would otherwise be used to inform consumers about the issue of discount rates and the costs of credit card use, preventing meaningful and cost conscious decisions about payment systems. For these reasons, prohibitions on surcharging are extremely detrimental to American consumers.

## ARGUMENT

### I. THE NO-SURCHARGE LAW FORCES MERCHANTS TO RECOUP SUPRA-COMPETITIVE INTERCHANGE FEES BY RAISING STICKER PRICES FOR ALL CONSUMERS.

The purpose and practical effect of the no-surcharge rule is to conceal the underlying true costs of credit by spreading those costs among all consumers. To adequately understand the policy considerations relating to the no-surcharge law, one must first understand the merchant credit card fees that comprise the underlying problem. Every time a consumer uses a credit card, the merchant generally pays 1–4%[1] of the transaction value in "merchant fees," most of which go to the issuing

---

[1] These fees are usually a hybrid of a per-transaction price and a percent of transaction cost, and sometimes can reach 15%, depending on the risk factor of the merchant. *See* Elizabeth Warren, *Antitrust Issues in Credit Card Merchant Restraint Rules*, Tobin Project Risk Policy Working

4

bank as "interchange fees."[2]   Interchange fees in America are the highest in the world, generating

approximately 50 billion dollars per year for credit card issuers, with more than 200 million dollars

of it from federal agencies alone.[3] The interchange fee rates jumped 23% between 2000 and 2006,

but because the volume of credit card transactions also increased dramatically, the absolute cost of

interchange fees for merchants increased 139% during the same period.[4]  "For many merchants,

credit card acceptance has become the fastest growing cost of doing business,"[5] while MasterCard

and Visa have seen a 74% increase in interchange revenues, now accounting for 20% of their overall

revenue.[6]

No-surcharge rules are the reason that credit cards are increasing in use despite being "more

expensive on average for merchants than cash and checks,"[7] by preventing most merchants from

passing these fees to the consumers who choose to use credit cards.  By returning a small portion of

---

Group, 1 (May 6, 2007) *available at* http://www.docstoc.com/docs/26252409/Antitrust-Issues-in-Credit-Card-Merchant-Restraint-Rules.

[2] These fees are technically divided between three banking entities, but for the purposes of this brief, the technical structure of credit card payment systems is irrelevant.  *See* Adam J. Levitin, *Priceless? The Social Costs of No-Surcharge Rules*, Business, Economics and Regulatory Policy Working Paper Series No. 973974, 7 (Jan. 2008 Revision) *available at* http://papers.ssrn.com/sol3/papers.cfm? abstract_id=1011106.

[3] *See, e.g.,* Keith Bradsher, *U.S. Looks to Australia on Credit Card Fees*, N.Y. TIMES, (Nov. 24, 2009), http://www.nytimes.com/2009/11/25/your-money/credit-and-debit-cards/25card.html?pagewanted=all; Andrew Martin, *Card Fees Pit Retailers Against Banks,* N.Y. TIMES (Jul. 15, 2009) http://www.nytimes.com/2009/07/16/ business/16fees.html.

[4]  Levitin, *supra* note 2, at 49.

[5] Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. REV. 1321, 1345 (2008) (citing *Financial Services Issues: A Consumer's Perspective, Hearing Before the Subcomm. on Financial Institutions and Consumer Credit of the H. Comm. on Financial institutions,* 108th Cong. 115 (2004) (statement of John J. Motley III, Sr. Vice President, Food Marketing Institute)).

[6] *See* James J. Daly*, Tenuous Gains in Card Profitability*, CREDIT CARD MGMT., May 2001, at 32, 33; Jeffrey Green, *Exclusive Bankcard Profitability 2007 Study & Annual Report*, CARDS & PAYMENT 27 (May 2007).

[7] David S. Evans & Richard Schmalensee, INTERCHANGE FEES IN CREDIT AND DEBIT CARD INDUSTRIES, PROCEEDINGS OF THE 2005 FEDERAL RESERVE BANK OF KANSAS CITY CONFERENCE, *The Economics of Interchange Fees and Their Regulation: An Overview,* 31 (2005), *available at* http://ssrn.com/abstract=744705.

these revenues in the form of rewards to a fraction of consumers, credit card companies have constructed a system whereby consumers actively, and unknowingly, choose the most costly payment system.  Increased fees to merchants fuel greater rewards, which fuel greater use, in a race to the top—precisely the opposite of competitive pricing.

The potent combination of market power and restraints on merchant speech have led to increased retail sticker prices and a massive cross-subsidy among consumers.  "[H]undreds of thousands of merchants . . . must take credit cards at any price because their customers insist on using those cards."  *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001) *aff'd*, 344 F.3d 229 (2d Cir. 2003).[8]  Simultaneously, the no-surcharge law prevents merchants from communicating or allocating the cost of credit card usage to the consumers who impose them by choosing to pay with credit cards.[9]  In practice, merchants must raise the unified sticker prices for all their goods to cover the costs of credit card merchant fees.  Cash buyers pay higher retail prices than they otherwise should, while credit card customers are discounted from the true cost of their transaction.[10] Credit card consumers receive all the benefits of credit card use, while cash customers receive no benefit and pay a premium to cover the difference—a pervasive cross-subsidy operating on all transactions.  As Elizabeth Warren has put it: No-surcharge rules operate to force most merchants "to charge *all* consumers higher prices in order to cover the costs of accepting credit card transactions.  As a result, non-credit consumers (food stamps, cash, checks, debit) end up subsidizing

---

[8] *See also United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 340-41 (S.D.N.Y. 2001) *aff'd*, 344 F.3d 229 (2d Cir. 2003)); General Court of the European Union, T-111/08, *MasterCard Inc. et al., v. Commission* (2012) 28 ("[T]he MasterCard payment organisation [sic] collectively exert market power vis-à-vis merchants and their customers.") *available at* https://www.competitionpolicyinternational.com/the-opinion-of-the-european-general-court-2/.

[9] Though technically allowed, discounts are also chilled by the no-surcharge law as merchants are justifiably concerned that they will incur criminal charges for violating the no-surcharge law's "subtle semantic distinction . . . as to what is lawful or unlawful.  *People v. Fulvio*, 517 N.Y.S.2d 1008, 1015 (Crim. Ct. N.Y. 1987).

[10] *See* Scott Schuh et al., FEDERAL RESERVE BANK OF BOSTON, *Who Gains and Who Loses from Credit Card Payments?* 21 (2010).

6

1   credit card consumers and, indirectly, subsidizing the entire credit card industry."[11]

2         The available empirical studies suggest these effects are not negligible.  A study of gas

3   station pricing in 1989—when fees were far lower—showed that at stations which maintained

4   unified pricing, cash consumers paid a 1.5% premium over the national averages to subsidize a

5   discount from cost to credit card users of 2%-3.5%.[12]  Today, the estimated overall cross-subsidy

6   between cash and credit users is staggering: "The average cash-paying household transfers $149 . . .

7   annually to card users [each of whom] receive[s] an average of $1333 annually from cash users."[13]

8         The recent explosion in rewards card programs has exacerbated the problem of hidden cross-

9   subsidies considerably.  Because, in addition to the no-surcharge law, network rules forbid

10  merchants from selectively accepting credit cards from within a given network, they must increase

11  prices to recoup the costs of increasingly generous, high-end rewards programs.  "Rewards cards

12  have risen from less than 25 percent of new card offers in 2001 to nearly 60 percent in 2005" and

13  now are considered to "drive the growth in . . . all credit card usage."[14]  The power of rewards to

14  increase credit card usage—though vitally, not to increase overall consumer spending—is closely

15  tied with increases in interchange revenue.  In fact, rewards cards and corporate cards sometime cost

16  merchants twice as much in fees.[15]  In 2007, Visa's ultra-premium rewards card's interchange rate at

17  large supermarkets—among the merchants with theoretically the most leverage to negotiate fees—

---

[11] Warren, *supra* note 1, at 1.

[12] *See* Adam J. Levitin, *The Antitrust Superbowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 BERK. BUS. L. J. 69, 110 (2006) (citing John M. Barron et al*., Discounts for Cash in Retail Gasoline Marketing*, 10 CONTEMP. ECON. ISSUES 89, 102 (1992)). In Delaware, all customers paid an extra 1.82¢ per gallon so that credit customers could pay 2.37¢ less per gallon than cost.  *Id.* at 102.  The cash consumer therefore bore between 30%-43% of the marginal cost to the merchant of the costs imposed by credit card transactions.  *Id.*

[13] Schuh, *supra* note 10, at 21.

[14] Levitin, *supra* note 5, at 1344–46.

[15] Levitin, *supra* note 5, at 1323.

7

was 2.20% and 10¢ per transaction, roughly double the average fee.[16]  For MasterCard, some cards average as much as 3.25% interchange fees.[17]

Far from being a problem for credit card networks, the across-the-board price increases work in their favor: "Card networks have the incentive to charge high interchange fees to inflate retail prices so that they can create more demand for their service . . . . As the card payments become more efficient and convenient than alternatives, the card networks are able to further raise the interchange fees, inflate the value of transactions and hence extract more profits" without lifting consumer surplus and merchant profits.[18]  Neither merchants nor non-credit card users gain any marginal benefit from these high-end rewards cards, but they both end up footing the bill for immense credit card company profits, and the generous rewards they provide to a tiny segment of consumers.

No-surcharge laws effectively gag merchants and deny consumers vital information about the relative costs of payment systems, ensuring that cards are never put into serious price competition with each other or with other payment systems.  The largest issuers like Citibank and Chase, representing more than 65% of the market, effectively set their interchange fees collectively, and do not allow merchants to differentiate between card networks from different issuers (*i.e.* Visa vs. Citibank Visa), entirely foreclosing competition.[19]  Commercial speech, as this case demonstrates, is essential to a free market economy.  *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977).  In a less competitive environment, companies have less incentive to price competitively and prices

---

[16] Levitin, *supra* note 5, at 1348.

[17] Levitin, *supra* note 5, at 1333.

[18] Zhu Wang, *Market Structure and Credit Card Pricing: What Drives Interchange?*, 28 INT'L J. OF INDUS. ORG. 86, 93 (2010) *available at* http://www.frbatlanta.org/news/CONFEREN/08payments/08payments_Wang.pdf.

[19] *See* Steven Semeraro, *The Antitrust Economics (and Law) of Surcharging Credit Card Transactions*, 14 STAN. J.L. BUS. & FIN. 343, 379–80 (2009); Market Share by Card Issuer, Credithub.com (2010) http://www.cardhub.com/edu/market-share-by-credit-card-issuer/ (last viewed Jul. 1, 2012)

therefore increase.  *Id.* at 377-78.  Commercial speech restraints like the one at issue ensure that issuers will be unconstrained by cost.  Thus, issuers will continue to engage in a race to the top of interchange fees, without concern that consumer usage will be impacted.[20]  The no-surcharge law effectively maintains unified pricing at the point-of-sale concealing from consumers that credit card users are free riding on cash consumers and simultaneously driving their own prices up.  Meanwhile, merchants have no choice but to accept credit card networks' mounting fees increases and expanding market share.

## II.   THE CROSS SUBSIDIES CREATED BY THE NO-SURCHARGE LAW ARE HIGHLY REGRESSIVE.

Credit card companies direct a small fraction of their supracompetitive profits to their richest customers at the cost of the low-income consumers, effectively implementing a regressive tax on all consumers.  Consumers using "cash"—which for purposes of this brief includes checks, debit cards, and food stamps—unknowingly pay a premium that subsidizes the credit card networks and their high income consumers.  The distribution of the benefits is no accident: credit card companies almost exclusively target affluent consumers and corporate accounts for the most generous rewards.[21]

On average, cash consumers are far lower income, and embrace a larger proportion of minorities, than the credit card users.[22]  Ten percent of adult Americans are completely "unbanked" and therefore ineligible for credit cards.[23] Within the lowest income quintile of Americans, 29% are

---

[20] Levitin, *supra* note 5, at 1341 (citing Merchant Discount Fees, Nilson Rep., Aug. 2006, at 11; U.S. Interchange Fees, Nilson Rep., May 2003, at 10.).

[21] Levitin, *supra* note 5, at 1346 n.76 (citing Burney Simpson, *Merchants Tackle Credit Card Fee Policies,* Cards & Payments, 32 Jan. 2006).

[22] *Id.*; *see also* William C. Dunkelberg & Robert H. Smiley, *Subsidies in the Use of Revolving Credit*, 7.4 J. Money Credit & Banking 477 (1975).

[23] Warren, *supra* note 1, at 1.

9

unbanked.[24]   Credit cards are also disproportionately unavailable to minorities: "While less than 5% of the white, non-Hispanic population lacks a bank account, 20% of non-whites and Hispanics are unbanked."[25]   Approximately 40% of the lowest income quintile of Americans have a credit card, while 67% households with income of $20-$50 thousand dollar per year, and 97% of households over earning over $120 thousand per year, have at least one credit card.[26]   Naturally, the distribution of access to credit cards means that this cross-subsidy overwhelmingly benefits high income consumers: "credit card spending by high-income consumers is nearly five times higher than credit card spending by low-income consumers, and . . . high-income consumers are 20 percentage points more likely to receive credit card rewards."[27]   No-surcharge laws facilitate a massive transfer of resources from cash users to credit card users, and even among credit card users, from low-income, low-rewards card users to high-income, high-rewards card users.   Never having to bear the costs of their usage, rewards card users use credit cards more often and more exclusively than those without rewards credit cards.[28]   "By far, the bulk of the transfer gap is enjoyed by high-income credit card buyers [income $100k+], who receive a $2,188 subsidy every year," as opposed to the low income credit card buyers, who "receive a subsidy [of] $613."[29]   In absolute terms, the estimated transfer is about $1.4 billion to $1.9 billion from rewards on gasoline and grocery purchases alone.[30]   Together, the no-surcharge law's effective unified-pricing mandate and the run-away rewards programs (also

---

[24] Levitin, *supra* note 2, at 44.

[25] *Id.*

[26] Schuh, *supra* note 10, at 8.

[27] Schuh, *supra* note 10, at 8.

[28] Andrew Ching & Fumiko Hayashi, FEDERAL RESERVE BANK OF KANSAS CITY, *Payment Card Rewards Programs and Consumer Payment Choice,* Working Paper No. 06-02, 4 (2006), *available at* http://www.kansascityfed.org/PUBLICAT/PSR/ RWP/ching_hayashi_paper.pdf.)

[29] Schuh, *supra* note 10, at 21.

[30] *Id.* at 3 (citing Efraim Berkovich, *Card Rewards and Cross-Subsidization in the Gasoline and Grocery Markets*, REV. OF NETWORK ECON. 11.4 (2012)).

10

facilitated by the no-surcharge law) are largely responsible for this enormous regressive and hidden

wealth transfer.  In effect, this allows credit card companies to tax the poor and give a small share of

those proceeds to the rich.

**III.    THE STATE'S JUSTIFICATION FOR THE LAW, AVOIDING MISLEADING AND DECEPTIVE PRACTICES, DOES NOT SURVIVE SCRUTINY AND ALTERNATIVE, LESS RESTRICTIVE MEANS ARE READILY AVAILABLE TO PROTECT CONSUMERS FROM POTENTIAL MERCHANT ABUSES WITHOUT HARMING COMMERCE.**

The California Attorney General's primary justification for the no-surcharge law is that "the

speech affected by the surcharge prohibition concerns prices that mislead customers about the real

cost of their purchase" and is "deceptive."  *See* Def.'s Mot. Summ. J. 13, ECF No. 22. This argument

falls flat, and this objective could be achieved through alternative, less restrictive interventions.

There is nothing about surcharging for credit cards that is inherently deceptive and the state

has proffered no evidence to demonstrate that this concern about deception is anything more than

theoretical.[31]  Even assuming however, that the state's concern were grounded in reality, the no-

surcharge rule is dismally crafted (and hugely overbroad) if its aim is in fact to protect consumers

from merchants who could advertise misleading sticker prices and thereby engage in a "bait and

switch."[32]  Moreover, as a practical matter, the recent nationwide settlement agreement with credit-

card companies obviates this concern by requiring the truthful and prominent disclosure of surcharge

---

[31] This is further supported by the fact that every major consumer advocacy organization has long opposed state no-surcharge laws.  *See, e.g.,* Molotsky, *Extension of Credit Surcharge Ban*, N.Y. TIMES, Feb. 29, 1984, at D12 (quoting Senator William Proxmire, stating in debate on the Senate floor that "[n]ot one single consumer group supports the proposal to continue the ban on surcharges.").

[32] A related defense of the no-surcharge rule argues that two-tiered pricing interferes with consumers' ability to comparison shop.  There is no logic to this argument as a justification for disallowing surcharging while permitting discounts as "there is no reason to think that a comparison of maximum prices (allowing discounts, not surcharges) is any better than a comparison of minimum prices (allowing surcharges, not discounts)." Levitin, *supra* note 5, at 1383. Because discounts and surcharges are mathematically equivalent, allowing one and not the other relies on an impermissible "underestimation of the public," *Bates*, 433 U.S. at 375, especially if merchants are required to disclose their pricing structure.

11

information to consumers.  *See In re Payment Card Interchange Fee And Merchant Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 234 (E.D.N.Y. 2013).  Putting aside the settlement, however, a far less restrictive and more effective approach to keeping merchants from abusing two-tiered pricing would be to simply institute disclosure rules.  Disclosure requirements like those proposed by the Federal Reserve Board would entirely protect consumers from abusive surcharging.[33]  *See Cash Discount Act, 1981: Hearings on S. 414 Before the Senate Banking Comm.*, 97th Cong., 1st Sess. 10 (Feb. 18, 1981) (proposing "a very simple rule": that both surcharges and discounts be allowed and "the availability of the discount or surcharge be disclosed to consumers.").  Thus, the nationwide settlement and adequately advertised credit card surcharges entirely dispose of concerns that consumers would be harmed by misleading prices.

## IV.    THE EXISTENCE OF NETWORK EFFECTS DOES NOT JUSTIFY THE NO-SURCHARGE LAW.

In analyzing the no-surcharge law, economic theorists have vastly overemphasized the importance of "network effects"—the idea that credit cards increase in value based on the number of merchants and consumers who use them—in analyzing the law's impact on consumer welfare.[34] These theories can only be employed as a defense of the no-surcharge rule under the woefully myopic belief that positive network effects are the *only* consequence of increased credit card spending.  In fact, if surcharging caused a decrease in credit card usage, it undoubtedly would increase overall consumer welfare because: first, some transactions will likely be diverted to other payment systems, like "PIN debit" which have their own network effects that will offset "harm" to credit card networks; second, credit card usage has specific externalities which undermine the facile

---

[33] *See* S. Rep. No. 97023, at 11–12 (1981); Council Directive 98/6, art. 3, 1998 O.J. (L 80) 28 (EC) (directing member states to adopt regulations requiring merchants to indicate both selling price and unit price for all covered products); *see also* Levitin, *supra* note 5, at 1384.

[34] *See* Levitin, *supra* at note 5, at 1385–90.

12

assumption that more credit card debt means more consumer welfare.

### A. Benefits to Consumers In Other Networks, Like Debit Card Users, Along With Reduction in Interchange Fees, Will More than Offset the Welfare Costs of Decreased Credit Card Usage.

Surcharging will create genuine competition between payment systems, benefiting debit card users and driving down merchant fees for everyone. Many other payment systems are subject to network effects, meaning that the diverted credit card usage would create comparable welfare gains in other networks.  For example, debit card usage is highly cross elastic with credit card usage,[35] and the marginal loss to credit card users would be offset by the benefits to debit users.  In fact, for newer payment systems adoption matters a great deal more.  By the time networks are as well-established and mature as credit cards, "the adoption and usage externality has become less important."[36]  The qualities that most consumers cite as their reasons for using credit cards – convenience, security from theft, widespread acceptance, speed at checkout – are fully replaceable by new payment systems like debit cards, at *half* the cost.[37]

The state has no legitimate interest in artificially sparing credit cards from free and open competition with other payment systems.  If the no-surcharge law is necessary to maintain credit cards' position vis-à-vis other payment systems, it is preserving a market failure that substantially harms consumers.  The Supreme Court has rejected state attempts to restrict advertising based on the "fear that people would make bad decisions if given truthful information."  *Thompson v. W. States*

---

[35] *See* Jonathan Zinman, *Debit or Credit?* 19 (Aug. 2007) (unpublished manuscript), *available at* http://www.dartmouth.edu/~jzinman/Papers/Zinman_DebitorCredit_aug08.pdf.

[36] Zhu Wang, *Market Structure and Credit Card Pricing: What Drives Interchange?*, 28 INT'L J. OF INDUS. ORG. 86, 95 (2010) *available at* http://www.frbatlanta.org/news/CONFEREN/08payments/08payments_Wang.pdf.

[37] David S. Evans & Richard Schmalensee, INTERCHANGE FEES IN CREDIT AND DEBIT CARD INDUSTRIES, PROCEEDINGS OF THE 2005 FEDERAL RESERVE BANK OF KANSAS CITY CONFERENCE, *The Economics of Interchange Fees and Their Regulation: An Overview,* 31 (2005). Many debit cards actually offer superior security through the use of pin systems and because debit card fraud does not affect a consumer's credit report, whereas credit card fraud does. Levitin, *supra* note 5, at 1387.

13

1   *Med. Ctr.*, 535 U.S. 397, 374 (1989); *Bates*, 433 U.S. at 364 (holding that commercial

2   speech "performs an indispensable role in the allocation of resources in a free enterprise system"). In

3   fact, the most likely and significant outcome of allowing merchants to frame the cost of credit as a

4   "surcharge" rather than a "discount" is a reduction in interchange fees as credit cards are forced to

5   compete on price with other payment systems.  By barring merchants from effectively signaling

6   differential costs of payments, the "no surcharge rules increase the price of all other payment system

7   to match the price of credit cards,"[38] explaining why "interchange fees in the United States are more

8   than double those in some other countries (Australia, EU cross-border, and the UK)."[39]  Australia's

9   relatively recent ban on no-surcharge rules immediately led to increased debit usage, while the

10  average MasterCard and Visa interchange rates fell by nearly half across the board.  Significantly, it

11  also led to increased volume on its network.[40]  Moreover, even without no-surcharge rules, credit

12  card companies continue to profit in Finland, the Netherlands, Portugal, Sweden, the United

13  Kingdom, Switzerland, and Australia.[41]  In fact, MasterCard voluntarily rescinded its own no-

14  surcharge rule for Europe in 2005.[42]  In light of these real world examples, it is impossible to say

15  with a straight face that no-surcharge rules really help consumers.  On balance, the effects the

16  decreased network effects for credit users are dwarfed by the gains in efficient market allocation.

---

[38] Levitin, *supra* note 5, at 1358 (*citing* Joseph Farrell, *Efficiency and Competition Between Payment Instruments,* 5 REV. NETWORK ECON. 26, 31 (2006)).  Under current common contract terms, no credit card issuer would benefit from lifting the restraints unilaterally because the other, presumably more costly, credit card companies would still be protected by their own no surcharge rules.  *See* Levitin, *supra* note 5, at 1359.

[39] Stuart E. Weiner & Julian Wright, *Interchange Fees in Various Countries: Developments and Determinants*, 4.4 REV. OF NETWORK ECON. 299 (2005) *available at* http://www.academia.edu/3095968/Interchange_Fees_in_Various_Countries_Developments_and_D eterminants.

[40] Levitin, *supra* note 2, at 61.

[41] Levitin, *supra* note 5, at 1389. For an overview of global regulation of interchange fees, *see* Terri Bradford & Fumiko Hayashi, FEDERAL RESERVE BANK OF KANSAS CITY PAYMENTS SYSTEM RESEARCH BRIEFING, *Developments in Interchange Fees In the United States and Abroad*, (Apr. 2008), http://www.kansascityfed.org/publicat/psr/briefings/psr-briefingApr08.pdf.

[42] *Surcharging in Europe*, Nilson Rep., Sept. 2004, at 6–7.

14

The no-surcharge law may be vital to the preservation of supracompetitive profit margins for credit card companies, but there is no economic theory that can twist this interest into a pro-consumer justification of the law.

### B.   Overconsumption of Credit Card Debt Causes Uniquely Harmful Social Externalities.

A supposedly pro-consumer defense of the no-surcharge law based on spurring expanded use of credit cards is radically out of step with the facts of credit card debt consumption.  Credit card debt in America was $870 billion by May of 2012.[43]  Moreover, "Americans racked up nearly $48 billion in new credit card debt in 2011, 424 percent more than what they charged in 2010, and 577 percent more than in 2009.[44]  Although total outstanding credit rose only about $4 billion, that number was largely offset by the magnitude of consumer defaults—*$44.2 billion worth.*"[45]  As a result of a phenomenon unique to credit card debt, consumers consistently underestimate both the credit debt they already hold, and the costs they will eventually incur.  In 2011, Americans held an average of $7,134 in credit card debt per household, but reported themselves as having an average of $2000 less.[46]  Credit card usage is also causally linked to personal bankruptcy, and credit card companies target bankrupt and near-bankrupt households with predatory offers.[47]  Following the ban

---

[43] The Associated Press, *Consumers Take on More Debt*, N.Y. TIMES, (Jul. 9, 2012), *available at* http://www.nytimes.com/2012/07/10/business/credit-card-debt-climbed-by-8-million-in-may.html?_r=0.

[44] Meg Handly, *Consumers Still Buried In Credit Card Debt*, U.S. NEWS AND WORLD REPORT (Mar. 12, 2012) http://www.usnews.com/news/articles/ 2012/03/12/consumers-still-buried-in-credit-card-debt (emphasis added).

[45] Handly, *supra* note 44.

[46] Meta Brown et al., FEDERAL RESERVE BANK OF NEW YORK, *Do We Know What We Owe? A Comparison of Borrower- and Lender-Reported Consumer Debt*, Oct. 2011, *available at* http://www.newyorkfed.org/research/staff_reports/sr523.pdf; *see also* Oren Bar-Gill, *Seduction by Plastic,* 98 Nw. U. L. Rev. 1373, 1396–402 (2004); Levitin, *supra* note 2, at 50–52 (describing various studies outlining consumer under appreciation of the cost of credit).

[47] *See* Teresa A. Sullivan, Elizabeth Warren, Jay Lawrence Westbrook *Credit Cards* at 108, THE FRAGILE MIDDLE CLASS: AMERICANS IN DEBT, Yale University Press  (2000), (outlining the connection between credit card usage and bankruptcy); Levitin, *supra* note 2, at 43.

on no-surcharge rules, Australia saw a 43% decrease in the gross of credit card debt.[48]   A

comparable reduction in the growth of American credit card debt, far from being a cost of

surcharging, would be a highly desirable side effect.

### CONCLUSION

For the foregoing reasons, amici Consumer Action, National Association of Consumer

Advocates, National Consumers League, and U.S. Public Interest Research Group urge this Court to

grant the injunction sought by the merchant Plaintiffs.


Dated:  November 19, 2014                   Respectfully submitted,


By:  /s/ Benjamin D. Brown
                                            Benjamin D. Brown (#202545)
                                            Cohen Milstein Sellers & Toll PLLC
                                            1100 New York Ave NW Suite 500 East
                                            Washington, DC 20005
                                            Telephone: (202) 408-4600
                                            bbrown@cohenmilstein.com

                                            ***Counsel for Amici Curiae***

---

[48] Levitin, *supra* note 12, at 137.

16