1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11 | ITALIAN COLORS RESTAURANT,                 No.  2:14-cv-00604-MCE-DAD
   | ALAN CARLSON, LAURELWOOD
12 | CLEANERS, LLC, JONATHAN
   | EBRAHIMIAN, LEON'S
13 | TRANSMISSION SERVICE, INC.,                **MEMORANDUM AND ORDER**
   | VINCENT ARCHER, FAMILY LIFE
14 | CORPORATION d/b/a FAMILY
   | GRAPHICS, TOSHIO CHINO,
15
16              Plaintiffs,

17        v.

18 | KAMALA D. HARRIS, in her official
   | capacity as Attorney General of the
19 | State of California,

20              Defendant.

21

22        This action challenges the constitutionality of section 1748.1 of the California Civil

23 Code, which states in subsection (a):

24        No retailer in any sales, service, or lease transaction with a
          consumer may impose a surcharge on a cardholder who
25        elects to use a credit card in lieu of payment by cash, check,
          or similar means. A retailer may, however, offer discounts for
26        the purpose of inducing payment by cash, check, or other
          means not involving the use of a credit card, provided that the
27        discount is offered to all prospective buyers.

28

                                    1

1   If a retailer imposes a surcharge, the cardholder is entitled to recover three times the

2   amount of actual damages, plus attorney's fees and costs.  Id. § 1748.1(b).

3        Plaintiffs are five California businesses—a restaurant, gas station, dry cleaners,

4   transmission repair business, and web design company—and their respective owners.

5   They filed this action against the California Attorney General, in her official capacity,

6   alleging that section 1748.1 violates the First Amendment as an unlawful restriction on

7   commercial speech because the statute regulates how retailers can describe the price

8   difference between cash and credit purchases.[1]   For example, a retailer could charge

9   $102 for a product and give a $2 discount, but could not charge $100 and impose a $2

10  surcharge, despite the situations being mathematically equivalent.  Thus, the statute

11  restricts how this $2 price difference is presented to the consumer.  Plaintiffs also allege

12  that the statute violates the Due Process Clause of the Fourteenth Amendment because

13  the law is void for vagueness.   Accordingly, in their operative First Amended Complaint

14  ("FAC"), Plaintiffs request that the Court declare the law unconstitutional and enjoin its

15  enforcement.  FAC, ECF No. 5 at 19.

16        After reviewing the filings in this case and holding a hearing on December 18,

17  2014, the Court finds that this regulation is an unconstitutional restriction on Plaintiffs'

18  freedom of speech and is void for vagueness.  Accordingly, Plaintiffs' Motion for

19  Summary Judgment (ECF No. 11) is GRANTED, and Defendant's Motion for Summary

20  Judgment or, in the alternative, Summary Adjudication (ECF No. 22) is DENIED.

21

22                                **BACKGROUND**

23

24        There is a long history of "no-surcharge" rules in the United States.  Originally,

25  credit card companies contractually banned any attempt to differentiate between credit

26  and cash purchases.  See Edmund W. Kitch, The Framing Hypothesis: Is it Supported

27  by Credit Card Issuer Opposition to a Surcharge on a Cash Price?, 6 J.L. Econ. & Org.

28       ─────────────
         [1] For convenience, payments made by cash, debit, and check are referred to as "cash."

1   217, 219-20 (1991).  But in 1974, American Express dropped its  private ban on dual

2   pricing.  Id. at 225.  That same year, Congress amended the Truth in Lending Act

3   ("TILA") to allow the practice.  Fair Credit Billing Act, Pub. L. No. 93-495, tit. III, § 306,

4   88 Stat. 1500, 1515 (1974) (codified at 15 U.S.C. § 1666f(a)).  The language used in the

5   1974 TILA amendment focused solely on the use of discounts: "a card issuer may not,

6   by contract, or otherwise, prohibit any such seller from offering a discount to a

7   cardholder to induce the cardholder to pay by cash, check, or similar means rather than

8   use a credit card."  Id.  Then, in 1976, Congress enacted a temporary federal ban on

9   surcharges.  See State Taxation of Depositories Act, Pub. L. No. 94-222, § 3(c)(1), 90

10  Stat. 197 (1976).  This ban was extended twice.  See Financial Institutions Regulatory &

11  Interest Rate Control Act, Pub. L. 95-630, § 1501, 92 Stat. 3641, 3713 (1978); Cash

12  Discount Act, Pub. L. No. 97-25, § 201, 95 Stat. 144 (1981).  When Congress let the ban

13  lapse, credit card companies advocated for similar legislation at the state level.  "No-

14  surcharge" laws were eventually enacted in ten states.[2]

15       In 1985, California passed its own "no-surcharge" law, which is the law now

16  challenged by Plaintiffs.   The stated legislative intent in passing the law was "to promote

17  the effective operation of the free market and protect consumers from deceptive price

18  increases for goods and services by prohibiting credit card surcharges and encouraging

19  the availability of discounts by those retailers who wish to offer a lower price for goods

20  and services purchased by some form of payment other than credit card."   Cal. Civ.

21  Code § 1748.1(e).

22       Only one California case has resulted from the enforcement of section 1748.1:

23  Thrifty Oil Co. v. Superior Court, 91 Cal. App. 4th 1070 (2001).  In Thrifty, the California

24  Court of Appeal held that the statute allows a non-deceptive dual-pricing scheme where

25  credit card users are charged more than cash users.  At Thrifty's California service

26  stations, both the cash price and the credit price for gasoline were prominently displayed

27  _____

         [2] See N.Y. Bus. Law § 518; Colo. Rev. Stat. § 5-2-212(1); Conn. Gen. Stat. § 42-133ff(a); Fla.
28  Stat. § 501.0117; Kan. Stat. Ann. § 16a-2-403; Me. Rev. Stat. 9-A, § 8-303(2) (repealed Sept. 27, 2011);
    Mass. Gen. Laws Ch. 140D, § 28A(a); Okla. Stat. tit. 14a, § 2-211(A); Tex. Fin. Code § 339.001.

1   and disclosed to customers. Id. at 1074. Further, Thrifty claimed that the higher credit

2   price represented the actual cost charged to Thrifty by the credit card company. Id. at

3   1077. While the plaintiff argued that the pricing scheme was unlawful because the credit

4   card price was higher than the "normal price," the court reasoned that the two-tiered

5   pricing was permissible since there was a "clear as day" disclosure of the price

6   difference and the price reflected the increased cost to Thrifty for credit card

7   transactions. While not conclusively determined, the court suggested that any dual

8   pricing system was legal under section 1748.1 as long as the price difference was

9   disclosed and limited to the additional credit card cost to the merchant. Id. at 1077-79.

10  However, in concluding that this pricing system constituted a "permissible discount, not

11  an unlawful surcharge," the court provided no further guidance on the boundary between

12  a discount and a surcharge. Id. at 1073.

13      Thus, section 1748.1 appears to permit Plaintiffs to charge more for credit card

14  purchases than cash purchases, regardless of the "normal price" of the item, as long as

15  this price difference is framed as a discount rather than a surcharge. Plaintiffs claim that

16  the statute is unconstitutional because, while it does not affect pricing, it does affect how

17  Plaintiffs can convey the prices to their customers. Retailers would like to emphasize

18  that the higher price is a surcharge because behavioral economics research has shown

19  that customers are "loss averse" and a potential economic penalty will motivate them to

20  change their behavior more than a potential economic benefit. See generally Daniel

21  Khneman et al., Anomalies: The Endowment Effect, Loss Aversion, and Status Quo

22  Bias, 5 J. Econ. Persp. 193, 199 (1991); Adam Levitan, The Antitrust Super Bowl:

23  America's Payment Systems, No-Surcharge Rules, and the Hidden Cost of Credit,

24  3 Berkeley Bus. L.J. 265, 280-81 (2006). It follows, Plaintiffs reason, that the most

25  effective way to encourage customers to switch from credit cards to cash payments is to

26  emphasize an economic penalty associated with the use of credit cards.

27      Retailers would like to discourage the use of credit cards because a "merchant" or

28  "swipe" fee (usually 2-3% of the purchase price) is charged when customers pay with a

1    credit card.  These fees can be incredibly expensive to a retailer.  Plaintiff Vincent Archer

2    states that credit card fees are the largest non-payroll-related expense at his business,

3    Leon's Transmission Service, Inc. and that, since 2004, the business has spent

4    $300,000.00 on swipe fees to Visa alone.  Archer Decl., ECF No. 14 at ¶¶ 4, 6.

5         Instead of raising the prices for credit card users and offering a discount for cash

6    users, many businesses just raise the price of the product to include the cost of the

7    swipe fee.  Since low-income customers are more likely to use cash, this can result in

8    low-income customers subsidizing the cost of the swipe fees.  Elizabeth Warren,

9    Antitrust Issues in Credit Card Merchant Restraint Rules, Tobin Project Risk Policy

10   Working Group, 1 (May 6, 2007); see also Scott Schuh et al., Who Gains and Who

11   Loses from Credit Card Payments?, 21 (Fed. Reserve Bank of Boston, Public Policy

12   Discussion Paper No. 10-03, 2010) (finding that "[t]he average cash-paying household

13   transfers $149 . . . annually to card users," each of whom on average "receives a

14   subsidy of $1,333 . . . annually from cash users").

15        Additionally, it has been found that when countries allow surcharges, swipe fees

16   decrease significantly.  As the swipe fees become more transparent, credit card

17   companies are incentivized to lower the fees to remain competitive.  America currently

18   has some of the highest swipe fees in the world.  Stuart E. Weiner and Julian Wright,

19   Interchange Fees in Various Countries: Developments and Determinants 14 (Fed.

20   Reserve Bank of Kansas City, Working Paper No. 05-01, 2005).

21        Until fairly recently, the state "no surcharge" statutes were redundant because

22   credit card companies had contractual provisions that prohibited retailers from imposing

23   surcharges.  However, in 2013, a nationwide settlement agreement with the credit card

24   companies resulted in the removal of these contractual provisions.  See In re Payment

25   Card Interchange Fee & Merch. Disc. Antitrust Litig., 986 F. Supp. 2d 207, 234 (E.D.N.Y.

26   2013).  Instead, retailers are now required to engage in truthful and prominent disclosure

27   of surcharge information to consumers and cannot recoup more than the cost of the

28   merchant fees as a surcharge.  Id.  Plaintiffs would like to impose surcharges now that

5

1  they are contractually permitted to do so, but fear that their actions would be illegal

2  under section 1748.1.

3

4  **STANDARD**

5

6      The Federal Rules of Civil Procedure provide for summary judgment when "the

7  movant shows that there is no genuine dispute as to any material fact and the movant is

8  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

9  Catrett, 477 U.S. 317, 322 (1986).  In a summary judgment motion, the moving party

10  always bears the initial responsibility of informing the court of the basis for the motion

11  and identifying the portions in the record "which it believes demonstrate the absence of a

12  genuine issue of material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its

13  initial responsibility, the burden then shifts to the opposing party to establish that a

14  genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v.

15  Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co.,

16  391 U.S. 253, 288-89 (1968).

17

18  **ANALYSIS**

19      **A.      Standing**

20      The Court must first address whether Plaintiffs have standing to bring this suit.

21  The jurisdiction of federal courts is limited to "cases" and "controversies" under Article III

22  of the Constitution.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992).  To

23  establish a case or controversy, Plaintiffs must show that there is (1) a concrete "injury in

24  fact"; (2) a causal connection between the injury and Defendant's conduct; and (3) a

25  likelihood that the injury will be redressed by a favorable decision.  Id. at 560-61.

26      "When the threatened enforcement effort implicates First Amendment rights, the

27  inquiry tilts dramatically toward a finding of standing."  LSO, Ltd. v. Stroh, 205 F.3d 1146,

28  1155 (9th Cir. 2000).  Because of the potential for chilling speech, Plaintiffs do not have

1    to wait until the injury occurs.  Ariz. Right to Life Political Action Comm. v. Bayless,

2    320 F.3d 1002, 1006 (9th Cir. 2003) (referring to this as the "hold your tongue and

3    challenge now" approach).  "In First Amendment cases, '[i]t is sufficient for standing

4    purposes that the plaintiff intends to engage in a course of conduct arguably affected

5    with a constitutional interest and that there is a credible threat that the challenged

6    provision will be invoked against the plaintiff.'"  ACLU of Nev. v. Heller, 378 F.3d 979,

7    984 (9th Cir. 2004) (quoting LSO, 205 F.3d at 1154-55).  Plaintiffs must only show "a

8    realistic danger of sustaining a direct injury as a result of the statute's operation or

9    enforcement."  Ariz. Right to Life, 320 F.3d at 1006 (internal quotation marks omitted).

10        Plaintiffs concede that no legal proceedings have been brought or threatened

11   against Plaintiffs under section 1748.1, nor has there been a history of past prosecution

12   or enforcement of the statute generally.  However, due to contractual agreements with

13   the credit card companies, retailers were not permitted to impose surcharges until 2013,

14   thus limiting the possibility of any enforcement actions under section 1748.1.  Plaintiffs

15   have provided declarations stating that they would like to implement surcharges now, but

16   believe they may be prevented from doing so by the statute.  Archer Decl., ECF No. 14

17   at ¶¶ 9-11; Chino Decl., ECF No. 16 at ¶¶ 7; Carlson Decl., ECF No. 15 at ¶¶ 7-8;

18   Ebrahimian Decl., ECF No. 17 at ¶ 7; Razuki Decl., ECF No. 18 at ¶ 7.

19        While the Attorney General claims that Plaintiffs can engage in their desired

20   behavior without facing prosecution, it is the citizens, not the state, who would enforce

21   this law.  See § 1748.1(b) (giving the cardholder a cause of action when a retailer

22   imposes a surcharge).  Thus, the Attorney General's promises hold little weight.  At the

23   hearing on this matter, the State conceded that if large retailers across the state began

24   engaging in dual-pricing behavior and used the word "surcharge" to describe the price

25   difference, an enforcement action would likely occur.  That is enough to convince the

26   Court that Plaintiffs have standing to challenge the constitutionality of the statute.

27   ///

28   ///

1   **B.   First Amendment**

2   The central question in this case is whether the restriction on surcharges imposes

3   an impermissible burden on commercial speech in violation of the First Amendment.

4   Other district courts reviewing similar state statutes have come to different conclusions.

5   Compare Expressions Hair Design v. Schneiderman, 975 F. Supp. 2d 430, 444-47, 450

6   (S.D.N.Y. 2013) (finding New York statute limits how retailers can communicate their

7   pricing and therefore implicates the First Amendment, applying intermediate scrutiny,

8   and granting a preliminary injunction against enforcement), with Dana's R.R. Supply v.

9   Bondi, No. 4:14cv134-RH/CA, ECF No. 29 at *5 (N.D. Fla. Sept. 2, 2014) (finding Florida

10   statute to be purely economic and upholding statute under rational basis test), and

11   Roswell v. Abbott, No. 1:14-cv-190-LY, ECF No. 55  at *6-7 (W.D. Tex. Feb. 4, 2015)

12   (finding Texas statute to be constitutional after conducting a similar analysis).

13   The first inquiry is whether Plaintiffs have met their burden of showing that the

14   First Amendment applies.  Clark v. Cmty. For Creative Non-Violence, 468 U.S. 288, 293

15   n.5 (1984).  According to Plaintiffs, the law "prohibits a certain class of speakers

16   (merchants) from communicating a certain disfavored message (identifying the added

17   cost of credit as a surcharge) and does so to discourage consumers from acting on that

18   message (by deciding to use a credit card)."  Pl.'s Mem. Supp. Summ. J., ECF No. 12, at

19   14-15.

20   The Attorney General counters that section 1748.1 only prevents retailers from

21   charging an additional amount to credit card users, separate from and in addition to the

22   assigned price, at the point of sale.  The government points to the legislative history for

23   the statute, which states that the purpose of the law was to prevent a "bait and switch"

24   situation where an additional charge is added at the cash register if the customer

25   chooses to use a credit card.  Instead, if retailers are going to make a last-minute price

26   change due to the payment method, under section 1748.1 they can only discount the

27   price for non-credit card users.

28   ///

1      Under the State's interpretation, section 1748.1 does not instruct retailers how to

2   assign their prices or otherwise communicate pricing or cost information to their

3   customers.  Because only economic activity (adding a surprise surcharge at the cash

4   register) is prohibited by the statute, the Attorney General argues that no speech is

5   implicated and the statute should only be subject to rational basis review.  Nebbia v.

6   New York, 291 U.S. 502, 537 (1933) (explaining that economic regulations will be upheld

7   if they "have a reasonable relation to a proper legislative purpose, and are neither

8   arbitrary nor discriminatory").  Under a rational basis review, the statute would most likely

9   be upheld.  See Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 488 (1955) ("If

10   the challenged classification bears a reasonable relationship to the accomplishment of

11   some legitimate government objective, the statute must be upheld.").

12      The Court finds that this is not an economic regulation that controls what is

13   charged or paid for something.  See Munn v. Illinois, 94 U.S. 113, 125 (1876).  As

14   conceded by the government in its briefing, "section 1748.1 [does not] instruct retailers

15   how to assign their prices."  Def. Reply, ECF No. 29, at 8.  Instead, section 1748.1

16   regulates speech that conveys price information, which is protected by the First

17   Amendment.  Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S.

18   748, 770 (1976).  Here, what is regulated is how those prices are conveyed to

19   customers, not the prices themselves.  See Expressions Hair Design, 975 F. Supp. 2d at

20   455 ("Pricing is a routine subject of economic regulation, but the manner in which price

21   information is conveyed to buyers is quintessentially expressive, and therefore protected

22   by the First Amendment.")

23      The State argues that Plaintiffs are able to communicate pricing as they choose

24   because Plaintiffs are already permitted to tell their customers about merchant fees.

25   But this does not mean, as the State claims, that Plaintiffs are free to "express

26   themselves regarding California's no-surcharge law."  Def. Mem. Supp. Summ. J., ECF

27   No. 22, at 10.  Plaintiffs cannot frame their price how they would like, even though they

28   are allowed to speak with their customers generally about the credit card industry and

9

1   the merchant fees that the industry charges.  "An individual's right to speak is implicated

2   when information he or she possesses is subjected to 'restraints on the way in which the

3   information might be used' or disseminated."  Sorrell v. IMS Health Inc., 131 S. Ct. 2653,

4   2665 (2011) (quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32 (1984)).

5       In Sorrell, the Supreme Court struck down a Vermont restriction on the sale,

6   disclosure, and use of pharmacy records to pharmaceutical companies for marketing

7   purposes as a violation of the pharmaceutical manufacturers' First Amendment rights.

8   Id. at 2665.  Justice Kennedy, writing for the majority, found that the statute singled out a

9   specific class of speakers (the pharmaceutical companies) and certain content (product

10  marketing).  Other groups, like those who wished to engage in certain "educational

11  communications," were permitted to use the pharmacy records.  Id. at 2663.

12      Similarly, section 1748.1 exempts government speakers from restrictions that

13  continue to apply to retailers.  See Cal. Civ. Code § 1748.1(f) (exemption for payments

14  made to electrical, gas, or water corporation).  Other California statues create similar

15  distinctions.  See Cal. Gov. Code § 6159(h) (cities, counties, courts, and other public

16  agencies exempt); Cal. Civ. Proc. Code § 1010.5 (state courts can impose surcharges

17  on fax filings); Cal. Food & Agric. Code § 3125(b) (state animal control officers can

18  impose credit card surcharges).  Nonetheless, as one court notes, "the Government

19  presents no convincing reason for pegging its speech ban to the identity of the owners or

20  operators of the [speaker]."  Greater New Orleans Broad. Ass'n v. United States,

21  527 U.S. 173, 191 (1991).

22      In addition to singling out a specific class of speakers, the Court also finds that

23  section 1748.1 is a content-based restriction.  "As a general rule, laws that by their terms

24  distinguish favored speech from disfavored speech on the basis of the ideas or views

25  expressed are content based."  Turner Broad. Sys. v. F.C.C., 512 U.S. 622, 643 (1994).

26  "A speech restriction is content-neutral if it is 'justified without reference to the content of

27  the regulated speech.'"  S.O.C., Inc. v. Cnty. of Clark, 152 F.3d 1136, 1145 (9th Cir.

28  1998) (quoting Clark, 468 U.S. at 293).  "Content-based regulations are presumptively

1 unconstitutional" and "pass constitutional muster only if they are the least restrictive

2 means to further a compelling interest." Id. Here, the content of the retailers' speech

3 must be scrutinized to determine if the price is framed as a permissible discount or an

4 impermissible surcharge, making this a content-based restriction.

5      Even a statute that appears neutral on its face as to content and speaker can be

6 rendered unconstitutional if its purpose is to suppress speech and it unjustifiably burdens

7 expression. Sorrell, 131 S. Ct at 2664. "Commercial speech is no exception." Id. A

8 "consumer's concern for the free flow of commercial speech often may be far keener

9 than his concern for urgent political dialogue." Bates v. State Bar of Ariz., 433 U.S. 350,

10 364 (1977). "Commercial speech is that 'which does no more than propose a commercial

11 transaction.'" Valle Del Sol Inc. v. Whiting, 709 F.3d 808, 818 (9th Cir. 2013) (quoting

12 Va. State Bd. of Pharmacy, 425 U.S. at 762 (internal quotation marks omitted). "Such

13 speech is protected by the First Amendment, but to a lesser degree than other types of

14 speech." Id.

15      Restrictions on commercial speech are traditionally subject to intermediate

16 scrutiny under the test laid out in Cent. Hudson Gas & Elec. Corp v. Pub. Serv., Comm'n

17 of N.Y., 447 U.S. 557, 566 (1980). Under the so-called Hudson test, the court asks four

18 questions: (1) whether the speech concerns lawful activity and is not misleading;

19 (2) whether the asserted governmental interest justifying the regulation is substantial;

20 (3) whether the regulation directly advances the governmental interest asserted; and

21 (4) whether the regulation is more extensive than is necessary to serve that interest. Id.

22 The burden is on the government to show that the elements of the test are satisfied.

23 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 504 (1996).

24      While the Attorney General argues that surprise surcharges would be misleading

25 to consumers, the State "may not place an absolute prohibition on certain types of

26 potentially misleading information . . . if the information also may be presented in a way

27 that is not deceptive." In re R.M.J., 455 U.S. 191, 203 (1982). "[R]estrictions . . . may be

28 no broader than reasonably necessary to prevent the deception." Id. While a surprise

1  surcharge would be misleading for the consumer, there are other ways to present the

2  information that is not deceptive.  For example, if the retailer displayed information about

3  the surcharge throughout the store and noted that the surcharge was due to merchant

4  fees, this speech would not be misleading, but would actually be informative and

5  accurate.  In that sense, this regulation has the effect of preventing one class (retailers)

6  from speaking "in an effective and informative manner" to their customers.  Sorrell,

7  131 S. Ct. at 2663.

8      The stated intent of the Legislature was "to promote the effective operation of the

9  free market and protect consumers from deceptive price increases for goods and

10  services by prohibiting credit card surcharges and encouraging the availability of

11  discounts by those retailers who wish to offer a lower price for goods and services

12  purchased by some form of payment other than credit card."  Cal. Civ. Code

13  § 1748.1(e).  The prevention of consumer deception is certainly a noble goal, and while

14  the Court assumes that these interests are indeed significant; that does not end the

15  Court's inquiry.  See Sorrell, 131 S. Ct. at 2559 (finding that Vermont had a significant

16  interest in safeguarding medical privacy with its restriction but that the statute still could

17  not satisfy heightened judicial scrutiny).  The State is also required to point to something

18  more than "mere speculation or conjecture" to "demonstrate that the harms it recites are

19  real and that its restriction will in fact alleviate them to a material degree."  Greater

20  New Orleans, 527 U.S. at 188 (citation omitted).

21      The State's position that surcharges present a real harm is undermined by the

22  fact that the statute exempts government agencies from the law.  "Exemptions from an

23  otherwise legitimate regulation of a medium of speech may be noteworthy for a reason

24  quite apart from the risks of viewpoint and content discrimination: they may diminish the

25  credibility of the government's rationale for restricting speech in the first place."  City of

26  Ladue v. Gilleo, 512 U.S. 43, 52 (1994).  If this speech is so deceptive and harmful, why

27  is the government allowed to engage in it?

28  ///

1    Finally, there must be a reasonable fit between a legitimate state interest and the

2    scope of the speech restriction.

3         The Government is not required to employ the least
     restrictive means conceivable, but it must demonstrate
4         narrow tailoring of the challenged regulation to the asserted
     interest—"a fit that is not necessarily perfect, but reasonable;
5         that represents not necessarily the single best disposition but
     one whose scope is in proportion to the interest served."

6

7    Greater New Orleans, 527 U.S. at 188 (quoting Bd. of Trs. of State Univ. of N.Y.

8    v. Fox, 492 U.S. 469, 480 (1989)).  "[T]hese standards ensure not only that the State's

9    interests are proportional to the resulting burdens placed on speech but also that the law

10   does not seek to suppress a disfavored message."  Sorrell, 131 S. Ct. at 2668.

11   "Restrictions must be narrowly drawn, and the State lawfully may regulate only to the

12   extent regulation furthers the State's substantial interest."  In re R.M.J., 455 U.S. at 203.

13   If the purpose of the statute is to prevent unfair surprise to the consumers at the

14   cash register, California's law is much broader than necessary.  A law mandating

15   disclosure of surcharges would be the most direct way to prevent consumer deception.

16   This method would also prevent any encroachment on the freedom of speech.   See,

17   e.g., Minn. Stat § 325G.051(1)(a) (allowing merchants to "impose a surcharge on a

18   purchaser who elects to use a credit card" so long as the merchant "informs the

19   purchaser of the surcharge both orally at the time of sale and by a sign conspicuously

20   posted on the seller's premises"); In re Payment Card Interchange, 986 F. Supp. 2d at

21   234 (limiting amount of surcharge to cost of acceptance and requiring retailers to engage

22   in truthful and prominent disclosure of surcharge information to consumers).

23   For the foregoing reasons, section 1748.1 cannot pass the intermediate scrutiny

24   required for a content-based, speaker-specific restriction on consumer speech.  The

25   Court must therefore strike down the statute as an unconstitutional restriction on First

26   Amendment rights.

27   ///

28   ///

1          C.      **Vagueness**

2          Plaintiffs also argue that section 1478.1 is unconstitutionally vague.  "A

3    fundamental requirement of due process is that a statute must clearly delineate the

4    conduct it proscribes."  Kev, Inc. v. Kitsap Cnty., 793 F.2d 1053, 1057 (9th Cir. 1986).  A

5    law is unconstitutionally vague when it fails "to give persons of ordinary intelligence

6    adequate notice of what conduct is proscribed" or that "permit[s] or authorize[s] 'arbitrary

7    and discriminatory enforcement.'"  G.K. Ltd. Travel v. City of Lake Oswego, 436 F.3d

8    1064, 1084 (9th Cir. 2006) (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000)).

9    "Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing

10   people for behavior that they could not have known was illegal; (2) to avoid subjective

11   enforcement of the laws based on 'arbitrary and discriminatory enforcement' by

12   government officers; and (3) to avoid any chilling effect on the exercise of First

13   Amendment freedoms . . . when First Amendment freedoms are at stake, an even

14   greater degree of specificity and clarity of laws is required."  Foti v. City of Menlo Park,

15   146 F.3d 629, 638-39 (9th Cir. 1998) (citing Grayned v. City of Rockford, 408 U.S. 104,

16   108-09 (1972); NAACP v. Button, 371 U.S. 415, 432-33 (1963)).

17         According to Plaintiffs, the law "does not clearly define the line between a

18   permissible 'surcharge' and a mathematically equivalent but illegal 'discount.'"  Pl.'s

19   Mem. Supp. Summ. J. at 3.  Thus, "merchants are forced either to operate in constant

20   fear of inadvertently describing a dual-pricing policy in an illegal way or to refrain from

21   dual pricing altogether, as many of the Plaintiffs have done, even though it is legal."[3]   Id.

22   The Attorney General argues that the statute is a straightforward business regulation

23   clearly apprising retailers that they may not impose a surcharge on credit card sales but

24   may offer a discount to induce payment by cash.  The government argues there is a

25   _____

26            [3] Only one Plaintiff, Salam Razuki, currently uses a dual-pricing system with the lower price
     framed as a discount.  See Ruzuki Decl., ECF No. 18 at ¶ 5.  Another Plaintiff, Jonathan Ebrahimian,
27   previously had a dual-pricing system in the 1990s, but stopped the practice after several months due to his
     fear of violating section 1478.1.  See Ebrahimian Decl., ECF No. 17 at ¶ 4. The other Plaintiffs in this case
28   would like to have a dual-pricing system but do not.  See Archer Decl., ECF No. 14 at ¶¶ 13-14; Chino
     Decl., ECF No. 16 at ¶¶ 4-7; Carlson Decl., ECF No. 15 at ¶¶ 8-12.

1   distinction between a surcharge and a discount because surcharges are "charged

2   separately from and in addition to the assigned price of an item" and imply that this

3   additional charge would occur "at the register."  Def.'s Reply at 3.

4          Even under the State's interpretation of the statute, it is not clear when a retailer's

5   conduct violates section 1748.1.  Prior California case law has already established that

6   charging $102 for credit payments and $100 for cash is lawful, regardless of the "normal

7   price" of the product, as long as the price difference is disclosed and justifiable based on

8   the price charged to the merchant for credit card transactions.  See Thrifty Oil Co.,

9   91 Cal. App. 4th at 1077-79.  According to the Attorney General, the price difference can

10  even be described in any way the retailer likes without violating section 1478.1.  See

11  Def.'s Reply at 4 (stating that the statute does not "instruct retailers how to assign their

12  prices or otherwise communicate pricing or cost information to their customers [including

13  the use of the word 'surcharge']").  But what happens if the price is listed as a "$100+2%

14  surcharge"?  Does that scenario constitute an unlawful surcharge since the percentage

15  is calculated at the cash register?  Or what would be the result if the price is listed as

16  $100, but there are large signs displayed throughout the establishment stating that a 2%

17  surcharge will be applied for purchases made with credit cards?  Does that cross the line

18  into unlawful conduct because it could be perceived as a surprise addition to the price?

19  How prominently must the surcharge price be displayed to avoid a "bait-and-switch"

20  situation?

21         While the Attorney General dismisses questions like these as "hypothetical," in

22  fact, these questions represent legitimate concerns that retailers must face when

23  determining whether to impose a legal dual-pricing system.  And despite having access

24  to extensive briefing from the Attorney General on the meaning of this statute and the

25  opportunity to question counsel at the hearing on summary judgment, the answers to

26  these questions are not clear to the Court.  Nor are the answers clear to the Plaintiffs, all

27  small businesses, or even the large national chains who have submitted an amicus brief

28  in this case.  See Amicus Brief from California Retail Association, California Grocers

15

1   Association, Safeway Inc., The Kroger Co., Walgreen Co., Albertson's LLC, Hy-Vee,

2   Inc., and Rite Aid Corporation, ECF No. 24.  These retailers would like to have a pricing

3   system where a surcharge is imposed for credit card purchases, but do not feel confident

4   that they could do so lawfully.  The fact that retailers—even large national retailers with

5   teams of in-house attorneys—do not use a dual-pricing system under the current law

6   due to fear of enforcement is proof that the law is not clear.

7          Finally, the State argues that the Court must work to save the statute under the

8   doctrine of constitutional avoidance.  Although the doctrine requires the Court to

9   "consider the [government's] limiting construction of the ordinance," the Court is "not

10  required to insert missing terms into the statute or adopt an interpretation precluded by

11  the plain language of the ordinance."  Foti, 146 F.3d at 639; see Nat'l Adver. Co. v. City

12  of Orange, 861 F.2d 246, 247 (refusing to limit ordinance's ban of off-site commercial

13  billboards when plain language of ordinance applied to all speech in off-site billboards).

14  The State's interpretation is not clear from the text of the statute.  There is no definition

15  for surcharge in the statute; there is nothing that would alert retailers to the fact that the

16  surcharges are only additional charges taken at the cash register.  The Court cannot add

17  these terms into the statute and retailers should not be expected to read the Attorney

18  General's brief to learn what the law means.  Thus, in addition to being an

19  unconstitutional restriction on free speech, the Court finds that section 1478.1 is also

20  unconstitutionally vague.

21

22                              **CONCLUSION**

23

24          Accordingly, Plaintiffs' Motion for Summary Judgment (ECF No. 11) is GRANTED,

25  and Defendant's Motion for Summary Judgment or, in the alternative, Summary

26  Adjudication (ECF No. 22) is DENIED.

27  ///

28  ///

1          The Court declares the California Civil Code section 1748.1 unconstitutional and

2   permanently enjoins its enforcement.

3          IT IS SO ORDERED.

4   Dated:  March 25, 2015

5

6

7   _____

8   MORRISON C. ENGLAND, JR., CHIEF JUDGE
    UNITED STATES DISTRICT COURT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28